UNITED STATES, Appellee

v.

ROBERT D. BLEVENS, Private E–2,
U. S. Army, Appellant

5 USCMA 480, 18 CMR 104

COL Burton F. Ellis, U. S. Army, LT COL Edward Duvall, U. S. Army, LT COL George M. Thorpe, U. S. Army, MAJ Edwin Doran, U. S. Army, and CAPT Albert C. Malone, Jr., U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, LT COL Thomas J. Newton, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted for two separate acts of desertion, escape from confinement, and an offense under Article 134, Uniform Code of Military Justice, 50 USC § 728. We granted review to consider several claims of error regarding the last-mentioned charge.

The specification in question reads as follows:

"In that Private–2 Robert D Blevens, . . . did, at or near Berlin, Germany, on or about the month of April 1953, wrongfully, unlawfully and knowingly affiliate himself with a group, to wit: State Security Service of the East Zone of Germany, advocating the violent overthrow of the United States Government, he, the said Robert D Blevens, then knowing the purpose thereof."

The accused contends the charge is fatally defective in that it fails to set out a specific intent to overthrow the United States Government by means of force and violence. A similar omission in the law officer's instructions is advanced as a claim of legal insufficiency in the instructions. Both arguments rest on the assumption that the specification charges a violation of the Smith Act, 18 USC § 2385, under the "crimes and offenses not capital" provision of Article 134. See: Dennis v. United States, 341 US 494, 95 L ed 1137, 71 S Ct 857; United States v. Schneiderman, 102 F Supp 87 (SD Cal 1951).

Although the court took judicial notice of the Smith Act, and the law officer referred to it in his final instructions, the Government does not concede that the Smith Act is in issue, or alternatively, that the specification must allege a specific intent. We need not relate the various particulars of each claim. Most important to the case is the Government's contention that regardless of any deficiencies under the Smith Act, the specification properly alleges, and the evidence adequately establishes, conduct to the discredit of the armed forces, in violation of Article 134.

If every essential element of a cognizable offense is stated in a specification it is immune from attack. Manual for Courts-Martial, United States, 1951, paragraphs 67, 69. United States v. Deller, 3 USCMA 409, 12 CMR 165. A successful attack can be made only when the omission of certain allegations results in a specification which states no offense whatsoever. United States v. Fout, 3 USCMA 565, 13 CMR 121. There can be no dispute here as to sufficiency of the specification in alleging a violation of Article 134.

It has been said that membership in an organization gives it "aid and encouragement"; and one accepting and retaining membership with knowledge of the unlawful purpose of a group "makes himself a party to the unlawful enterprise in which it is engaged." Frankfeld v. United States, 198 F2d 679, 684 (CA4th Cir 1952), cert den 344 US 922, 97 L ed 710, 73 S Ct 389, 345 US 913, 97 L ed 1348, 73 S Ct 652. Violence as such is repugnant to most law-abiding persons.

**483**

When the object of such violence is the overthrow of duly constituted authority, advocacy of that means of action becomes abhorrent. Particularly is this true if the violence is directed to the overthrow of our own Government. "It was established by the people themselves, it did not arise of its own accord; it was not imposed from without." Communist Party of USA v. Subversive Control Board, —— F2d ——, (CA DC Cir) (December 23, 1954).

Membership by a school teacher in an organization advocating the violent disestablishment of the United States Government has been regarded as conduct requiring dismissal. Adler v. Board of Education, 342 US 485. It seems to us that such membership is even more profoundly evil in the case of a person in the military establishment. True, affiliation implies something less than membership (Bridges v. Wixon, 326 US 135, 143), but the supreme duty of the military is the protection and security of the government and of the people. Hence, aside from a specific intent on the part of the accused to overthrow the government by violence, the conduct alleged is definitely discrediting to the armed forces.

Without directly denying the sufficiency of the charge as a violation of the Uniform Code, the accused insists that it be regarded only as a purported violation of the Smith Act. The core of his argument is the rule that the theory upon which a case is tried must be "strictly adhered to on appeal." Pearson v. United States, 192 F2d 681 (CA6th Cir 1951). San Juan Light and Transit Co. v. Requena, 224 US 89, 56 L ed 680, 32 S Ct 399. This principle was urged in several cases before this Court. See: United States v. Mundy, 2 USCMA 500, 9 CMR 130; United States v. Bowers, 3 USCMA 615, 14 CMR 33. And, we certainly adhere to it. The specific question, however, is whether it applies to this case.

The change of theory doctrine is fundamentally a rule to prevent injustice. See: Wagner v. United States, 67 F2d 656 (CA9th Cir 1933). The circumstances under which it normally may be invoked were recited in Pearson v. United States, supra. In that case, the defendant was charged with receiving and possessing property know to have been stolen and transported in interstate commerce. There was no proof of actual knowledge, and the evidence did not show possession from which it could be inferred that the accused knew the property was stolen. Consequently, on appeal from the conviction, the Government argued the theory that the defendant, in fact, aided and abetted the unlawful possession by a co-accused. Rejecting the argument, the Court of Appeals said (pages 694–695):

". . . To state the general rule, it is well settled that the theory upon which the case was tried in the court below must be strictly adhered to on appeal or review; and in order to determine the theory of a case as presented to the trial court, the appellate court will look to the entire record and the briefs of counsel, and will construe the pleadings on the theory most clearly outlined by the facts stated and according to their general scope and tenor. 3 Am. Jur. 35, 38.

• • • • •

". . . The nature and burden of proof are quite different in a case where the accused is sought to be held for the crime of possessing stolen property with knowledge that it has been stolen, and where he is sought to be held as aiding and abetting the possession of stolen property by another with knowledge that the property has been stolen. In the case where he is charged with such possession with guilty knowledge, the mere possession of the recently stolen property gives rise to inferences of guilty knowledge—some courts term it a presumption of guilty knowledge—unless he gives a satisfactory explanation of such possession consistent with his innocence. Once the possession of the recently stolen property is proved, the burden is upon the accused to proceed with an explanation to show his innocence. But in a case where he is charged with aiding and abetting, the mere fact of aiding and

abetting in the possession of the property does not give rise to inferences of guilty knowledge, or knowingly assisting in another's receiving and possessing stolen property. No such inferences of guilty knowledge are to be drawn against one charged with aiding and abetting as are to be drawn against one in actual possession of the recently stolen property. There is no burden immediately thrust upon one charged with aiding and abetting to give an explanation consistent with innocence such as is placed upo none who was found in possession of the stolen property."

No comparable situation is present here. The essential elements of the offense remain unchanged; no additional or different principle of law is required to support the conviction; and the accused has no burden of defense which he did not have at the trial. In short, the only difference in the Government's position on appeal from that at the trial is in the description of the offense. Misdescription cannot nullify an otherwise valid charge and conviction, when the accused is in no way "embarrassed or hampered in his defense by the misnomer of the offense." United States v. Bey, 4 USCMA 665, 668, 16 CMR 239.

A situation substantially similar to that here was presented to the Supreme Court of Indiana in Southern Ry. Co. v. Howerton, 182 Ind 208, 105 NE 1025, 106 NE 369. At the trial, the case proceeded on the theory that it was a common law action for negligence. On appeal, the plaintiff conceded that common law liability was not shown. He contended, however, that the complaint stated a cause of action, and the evidence established a right of recovery, under the Federal Employers' Liability Act, 45 USC § 51. The defendant argued that the plaintiff could not change his theory on appeal. In holding the change of theory rule inapplicable, the court said:

"We are not disposed to depart in the least from the established rule of procedure, requiring a complaint to be based on a definite theory, but that does not present the question here,

for there could be but one cause of action arise from the facts, and that cause under the federal act, though some common-law defenses remain. . . . There can be no doubt that the evidence is present to affirm under the federal act, but the question of orderly procedure is present, and being insisted on by appellants. It is doubtless true that appellants in seeking reversal are not in the same situation as appellee, insisting on affirmance. With respect to appellants, it is of course true that they could make no election as to the remedy, if the power of election existed; that was a right solely in appellee, and they were compelled to meet the case as elected by appellee, but it so happens that there was but one remedy, and it is apparent that the case was easier met under the rules of the common law than under the federal statute. . . . If appellants' rights were not properly adjudicated, then it is clear that a new trial must be granted; if they were, then we should be sacrificing the merits of the case to mere procedure. . . . here the recovery is had upon the theory most favorable to appellants, and there could have been no recovery on that theory, without the ground for recovery on the other theory being fully laid, in addition to the fact that there is no ground for the application of two theories, as a matter of law, and it would therefore seem a legal solecism to say that the cause proceeded to judgment upon a theory for which there was no law, but that there ought not to be a reversal for that reason, where all the allegations of the complaint and the evidence make a case upon the only law upon which an action could be predicated. Oolitic Stone Co. v. Ridge, 174 Ind. 558, 575, 91 N.E. 944.

"The court below was bound to know that state of the law in dealing with the case, though it may have erred in its application. It is not a case of want of a good complaint, but of irregularity in the proceedings under it."

The rationale of the Howerton case was applied to a criminal proceeding

in Marks v. State, 220 Ind 9, 40 NE2d 108. There, the defendant was tried and convicted on an indictment believed to allege a violation of a particular statute. The trial judge imposed sentence as authorized by that statute. The appellate court held this statute was repealed and replaced in pertinent part by a later enactment. But, the court determined that the allegations of the indictment and the evidence were sufficient to support the conviction for violation of the later law. Answering the defendant's claim that the state could not change its theory of prosecution, the court said:

"In sustaining the sufficiency of the first count of the indictment, we have departed from the theory of the court below. . . . There is a general rule that the theory adopted by the court and the parties in the trial of a case will be accepted and followed on appeal. But there are exceptions to the rule. . . . When a question is presented by the record, it is decided upon the record, and the theory adopted by the parties in the trial and in argument will not be followed when a decision based upon that theory would create a precedent calculated to mislead the profession and to lend confusion in further litigation. Big Creek Stone Co. et al. v. Seward et al., 1896, 144 Ind. 205, 42 N.E. 464, 43 N.E. 5; Cleveland, C., C. & St. L. R. Co. v. Moore, Receiver, et al, 1908, 170 Ind. 328, 82 N.E. 52, 84 N.E. 540; Keeshin Motor Express Co. et al. v. Glassman, Ind. Sup. 1942, 38 N.E. 2d 847. To sustain the view adopted by both parties and by the court below, and hold the indictment good under the earlier statute, would require that we overlook our conclusion that the statute is repealed and is no more and might lead to future attempts at prosecutions under the statute and the embarrassment of courts in the determination of the issue should the indictment be attacked upon the ground that the statute has been repealed."

Our own opinion in United States v. Deller, supra, reaches the same conclusion as the cited cases. Hence, aside from any requirement of allegation,

proof, and instruction on specific intent under the Smith Act (see Dennis v. United States, supra), the specification and the instructions on the elements of the offense here are plainly sufficient for a charge of conduct to the discredit of the armed forces, in violation of Article 134, 50 USC § 728. United States v. Long, 2 USCMA 60, 6 CMR 60.

The accused next contends that the evidence is legally insufficient to prove the allegations in the specification. He argues, first, that it was not shown that the State Security Service (Staatssicherheitsdienst, hereinafter referred to as SSD) advocates the violent overthrow of the United States Government.

The SSD was described by the Assistant Chief of the Intelligence Section, Berlin Command, as a "Governmental Section of the . . . East German Government." It controls internal security, and is also concerned with espionage and propaganda. The accused concedes that the East German Government is a satellite of Soviet Russia. He also admits that both governments are dominated by the Communist Party, which itself advocates the violent overthrow of the Government of the United States. These admissions accord with the accused's testimony at the trial. He there testified that he believed the Communist Party advocates the violent overthrow of the United States Government and that it controls "the whole Russian Government," which in turn controls the East Zone of Germany. He argues, however, that it was not shown that the SSD itself is an entity which has that purpose.

In his brief, the accused speaks of the SSD as "a small internal segment of a satellite group composed of employees of a vastly different racial and cultural background themselves in the status of a conquered, subjugated and occupied people." At the trial, H. Glockenstein, one of his witnesses described it much differently. Glockenstein was familiar with the SSD. In fact, his brother-in-law was a member. However, he worked for agents of the American Counter-intelligence service. He frequently stayed in East German

areas. He testified that the SSD is a Communist organization and represents the connection between Russia and East Germany. He also said that a member of the SSD "must be a Communist in the first place and he must have some papers to substantiate that." Another witness, reputed by Glockenstein to be an SSD agent, and who lived in the East sector at the time of trial, disclaimed "exact" knowledge of the SSD because she "did not interest . . . [herself] in that." However, she admitted that the organization was "almost" like the Gestapo. Also, she acknowledged that a Heinz Jordan was an SSD agent.

The evidence further shows that SSD agents arranged for the accused's attendance at a school in Bautzen, East Germany. According to the accused, the school teaches "about the Communist Party." One of his witnesses, who also attended the school, characterized it as "more or less based on a—faith school." Moreover, it appears that when the accused first went to the East Zone, SSD agents provided him with "all kinds of communistic books." He was to read them, and then write articles which were "supposed to follow the communist line."

Section 2 of the Internal Security Act of 1950, 50 USC § 781, sets out Congressional findings on the existence and the nature of the world Communist movement. A part of the section was read to the court. The extent to which these legislative findings are entitled to consideration in a judicial proceeding was considered by the United States Supreme Court in Galvan v. Press, 347 US 522, 98 L ed 911, 74 S Ct 737. The court said (page 529):

". . . Under the 1940 Act [Alien Registration], it was necessary to prove in each case, where membership in the Communist Party was made the basis of deportation, that the Party did, in fact, advocate the violent overthrow of the Government. The Internal Security Act of 1950 dispensed with the need for such proof. On the basis of extensive investigation Congress made many findings, including that in § 2 (1) of the Act that the 'Communist

movement . . . is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a communist totalitarian dictatorship,' and made present or former membership in the Communist Party, in and of itself, a ground for deportation. Certainly, we cannot say that this classification by Congress is so baseless as to be violative of due process and therefore beyond the power of Congress."

On the record as a whole, therefore, we hold that sufficient evidence was presented to the court from which it could reasonably conclude that the SSD advocates the overthrow of the United States Government by violence.

Other aspects of the accused's claim of insufficiency of the evidence relate to his knowledge of the illegal purposes of the SSD, **Headnote 5** and whether he, in fact, affiliated himself with that organization. In considering these matters, we are, of course, not permitted to judge the credibility of the witnesses or to determine disputed questions of fact. The findings of the court-martial and the board of review must be sustained if there is substantial evidence to support them. United States v. Sell, 3 USCMA 202, 11 CMR 202.

The accused arrived in the Berlin Command in January 1953. On February 7, he became involved in a drunken dispute with a German National and military personnel. A few days later he was informed by his commanding officer that a charge of being drunk and disorderly was to be lodged against him, together with a recommendation for trial by special court-martial. On receiving the information, the accused, "screamed that he might as well be in the Russian Army as in an American stockade." He made statements of a similar import to other persons. Later, he ascertained the location of the Russian Headquarters in the East Zone of Berlin, and inquired about living con-

ditions in that area. He asked his girl friend, Ingrid Jonek to find out what kind of "reception" he would get there. Miss Jonek questioned a Paula Kelch. The latter worked with Heinz Jordan, an SSD agent. On advice of Kelch, Jonek told the accused that he "would be treated like a king."

On February 13, 1953, the accused met his girl friend at Kelch's apartment. He and the girls proceeded to the East Zone. In accordance with previous arrangements, they met Jordan and another SSD agent, Kreuger. They all drank champagne. Later, Kreuger obtained accommodations at the Intourist Hotel for Ingrid and the accused. The next day Jordan brought the accused civilian clothing and gave him identification passes for himself and the girl. On a second visit, Jordan came with two men, one of whom the accused said was an agent of the N.K.V.D. (the Soviet Secret Police). They went to the Karlshorst, where they were joined by a Colonel Karpov. Miss Jonek described Karpov as a "boss"; and the accused considered him as the man in "control of all foreigners coming into East Germany or into the East Zone of Germany." The party proceeded to Potsdam. The accused and Miss Jonek were provided with quarters and funds. They remained there for about four weeks.

During their stay in Potsdam, the accused and Miss Jonek were given a great number of "communistic books" to read. Miss Jonek was asked to induce American soldiers to go to the East Sector. As for the accused, it appears that the "Russians" saw an identification card issued to the accused by the Public Information Office in Japan. The accused had obtained the card when he served in that area. The accused was asked if he was "a journalist." He said that he was, and "built up . . . [himself] in that particular activity." He was asked to write an article on "some opinion of his on communism." And, he was advised that he might work with a John Peet in writing articles which "were supposed to follow the communist line." The accused agreed to write the requested article. Later, he submitted an article

which he copied directly from a Maxim Gorki book.

About the middle of March, the accused and Miss Jonek were taken to Dresden. They stayed for almost three weeks at a hotel without charge. In that period, the accused signed a Russian translation of his article, which he was told was "very good." On March 31, they moved to Bautzen. There, they were registered at the Hotel Stadt Bautzen. They were instructed that, if anyone asked, they were "to say they were Russians." The next day, the accused received a pass authorizing his movement in East Germany. In the pass, his occupation was listed as "journalist."

For the first two weeks in Bautzen, the accused and Miss Jonek were left much to themselves. Then the accused was informed that he would work with John Peet. He signed "a paper" authorizing Peet to correct any articles that he might write. Miss Jonek left for Berlin. She returned a few days later. Then, she and the accused went to an apartment in the East Zone of Berlin. This apartment was "furnished by the Russians." On April 24, Colonel Karpov met the accused; he told him that it was "about time to get to work." The accused's immediate task was to talk to American soldiers who would be brought to the apartment by Miss Jonek. The accused discussed the matter with his girl friend. They decided to return to the West Zone of Berlin.

On returning to the West Zone, the accused was taken into military custody. Pending investigation, he was confined in the stockade. After a few days, Miss Jonek, her mother and Paula Kelch visited him. On that visit, plans were made for the accused's escape. Jonek told him that the Russians knew he could get out of the stockade. Others whom they knew had done so. They suggested the same method of escape. One week later, Ingrid and Paula again visited the accused. Ingrid gave him a saw. Paula advised him that Jordan had arranged for his return to the East Zone. That night, the accused escaped from the stockade. He proceeded directly to Jordan's house in the East Sector, where he was joined by Ingrid.

At the trial, the accused gave a number of different reasons for his escape from the stockade and return to the East Zone. First, he attributed his action to a desire to protect Miss Jonek's family which was "in trouble with the Russians." Then, he said that he acted in order to capture someone and do "a little bargaining." Next, he contended that he wanted to "clear my name" by getting "Heinz Jordan or another Russian over there . . . to tell just what happened." Finally, he said that he feared for the safety of his own family.

The day after the accused returned to the East Zone, he and Ingrid were installed in the apartment they had previously occupied. They remained together from May 10 until May 20. During that time the accused was provided with a special pass, and he went to work at the Karlshorst Compound, "copying American documents that were written in longhand." Moreover, he was asked to maintain supervision over another girl who was to work at enticing American personnel into the East Zone, but whose Russian loyalty was suspect.

One night at the Karlshorst, in the absence of other persons, the accused "grabbed" the first thing he could find in a file cabinet and hid it in his jacket. According to his testimony, Kreuger came the next night and took him into custody. He was brought to Karlshorst Headquarters and questioned about his theft. Then he was taken to Potsdam, and confined in the same apartment that he had when there with Ingrid. Some time later he was incarcerated in a jail in Dresden. There, he was allegedly given a series of severe beatings. As a result he signed a confession to the effect that he was engaged in counterintelligence work for the Americans. After making the confession, the accused was told that he would be tried. Instead, about August 8th he was sent to the political school in Bautzen. And apparently he had full freedom of movement in that town.

When he had attended school for about a week, the accused approached Glockenstein. He learned from a fellow student, who also acted as a Russian informer, that Glockenstein worked for the American Counterintelligence Corps. On the accused's urging, Glockenstein agreed to go to West Berlin to speak with a Counterintelligence agent about the accused's return or possible employment as an agency informer. With money provided by the accused, Glockenstein went to the West Zone. He was to report back in three days. When he failed to do so, the accused sought the help of Mrs. Glockenstein. She obtained a pass in her husband's name, but with the accused's description. Accompanied by Mrs. Glockenstein, the accused reached the West Zone. He proceeded to look for Ingrid. Not finding her, he returned to Mrs. Glockenstein's father's apartment. There he was apprehended by the French police.

As previously noted, the accused admitted in his testimony, that he believes that the Communist Party advocates the violent overthrow of the United States Government. He also admitted Communist Party control over the "whole Russian Government" and the latter's control of East Germany. He showed familiarity with its workings by claiming to recognize the Communist handshake of a person who visited him at the stockade. This person allegedly represented himself as a lawyer who was to defend him. On the accused's inquiry, the visitor said that the defense expenses would be paid by the Communist Party. He also told him certain things which led the accused "definitely" to assume that the visitor was a member of the Communist Party because, "you don't know about it unless you are a member." Although he stoutly maintained his loyalty to the United States, he admitted that when urged to reveal what he had learned in the East Zone, he steadfastly refused to talk. In his own words: "When I came back—the Confinement Officer here will verify it—he has been after me for the last four months to get me to talk and I won't do it."

A considerable amount of other testimony appears in the record. Much of it constitutes an attempt by the accused to give an innocent meaning to his conduct. However, sufficient evidence has

been set out to provide an adequate basis for consideration of the issues raised by the accused.

Especially noteworthy in the appraisal of the evidence is the fact that the accused was asked by SSD agents to write articles which were "supposed to follow the communist line." He knew that the Communist Party advocated the violent overthrow of the United States Government. His knowledge was certainly reinforced by the "communistic" books which were given to him to read. That he read at least some of these books may be reasonably inferred from the fact that he used an extract from one as a sample of his journalistic ability. These circumstances, together with the other knowledge of communist matters shown by the accused, provide a substantial basis for a finding that he knew the SSD advocated the violent overthrow of the United States Government.

Affiliation implies something less than membership in an organization, but more than passive sympathy with its purposes. It contemplates an active alliance in furtherance of the functions of the group. Thus, in Bridges v. Wixon, 326 US 135, 89 L ed 2103, 65 S Ct 1443, the United States Supreme Court said (pages 143–144):

"The legislative history throws little light on the meaning of 'affiliation' as used in the statute. It imports, however, less than membership but more than sympathy. By the terms of the statute it includes those who contribute money or anything of value to an organization which believes in, advises, advocates, or teaches the overthrow of our government by force or violence. That example throws light on the meaning of the term 'affiliation.' He who renders financial assistance to any organization may generally be said to approve of its objective or aims. So Congress declared in the case of an alien who contributed to the treasury of an organization whose aim was to overthrow the government by force and violence. But he who cooperates with such an organization only in its *wholly lawful activities* cannot by that fact be said as a matter of law to be 'affiliated' with it. Nor is it conclusive that the cooperation was more than intermittent and showed a rather consistent course of conduct. Common sense indicates that the term 'affiliation' in this setting should be construed more narrowly. Individuals, like nations, may cooperate in a common cause over a period of months or years though their ultimate aims do not coincide. Alliances for limited objectives are well known. Certainly those who joined forces with Russia to defeat the Nazis may not be said to have made an alliance to spread the cause of Communism. An individual who makes contributions to feed hungry men does not become 'affiliated' with the Communist cause because those men are Communists. A different result is not necessarily indicated *if aid is given to or received from a pro-scribed organization in order to win a legitimate objective in a domestic controversy.* Whether intermittent or repeated the act or acts tending to prove 'affiliation' must be of that quality which indicates an adherence to or a furtherance of the purposes or objectives of the proscribed organization as distinguished from mere cooperation with it in lawful activities. The act or acts must evidence a working alliance to bring the program to fruition."

There can be no doubt that when the accused submitted an article which was acknowledged by SSD agents to be "very good," and which presumably followed the "communist line" as it was supposed to, he indicated "an adherence" to the purposes of that organization. He gave further evidence of his adherence by providing blanket authorization for the correction of his future articles by a designee of the organization. So, too, his acceptance of accommodations, clothing, and funds while awaiting assignment to a job by the organization is much more than mere "cooperation" in the lawful activities of the SSD. They indicate a consciousness of an active connection with the organization.

It may be that the accused changed his mind about his affiliation, when he learned that his immediate work was to assist in enticing American personnel into East Germany. However, in view of his subsequent escape from the stockade, and direct return to the East Zone, such change of attitude is questionable. But, we may regard these considerations as irrelevant. The accused is charged with affiliating himself with the SSD in April 1953. The evidence amply supports that charge.

The accused contends for the first time that, regardless of the evidence, the law officer erred in █ failing adequately to define "affiliate." At the arraignment, the accused questioned the meaning of the word. The law officer then defined it as follows:

" 'To receive or be on friendly terms, to associate with, to consort with, to connect or associate oneself with, to be united with, be in close connection with, or allied or attached."

He defined it again, in the same way, in his final instructions. These were submitted in advance to defense counsel and the accused for consideration and study. No request was made for elaboration or clarification of the word, as such. However, certain requests to instruct were made by the accused. Two of these requests were given by the law officer in the following form:

". . . if you find that there was no more than rare social contracts between the accused with persons suspected of being associated with or being members of Communist dominated organizations, as alleged, in the East Sector of Berlin or in the East Zone of Germany, you should find the accused not guilty of Charge IV.

". . . If you believe that the accused barely knew of or on very rare occasions had no more than social contact with persons or organizations, such as the State Security Service, which were alleged to be Communist dominated, you should find the accused not guilty of the Specification of Charge IV and Charge IV."

Instructions must be read as a whole. United States v. Hatchett, 2 USCMA 482, 9 CMR 112. Whatever may be the deficiencies of the initial definition standing by itself, joined with later statements, the whole is sufficient to provide a proper guide for the court. A clear distinction is drawn between permissive social associations and active union or close connection with the organization. As a unit, the instructions adequately inform the court that it must find beyond a reasonable doubt that the accused's conduct with respect to the SSD was, in substance, of "that quality which indicates an adherence to or a furtherance of" its illegal purposes.

The accused's final point is an attack on the legality of the sentence. The approved sentence includes █ confinement for thirteen years. The two offenses of desertion, one terminated by apprehension, authorize confinement for five years; escape from confinement carries a maximum confinement of one year. Thus, exclusive of the offense under consideration, the total permissible confinement is six years.

At the trial, the law officer instructed the court that the offense in issue is punishable by confinement for ten years. However, the accused argues that if the offense is not regarded as a violation of the Smith Act, it is improper to relate it, as did the board of review, to the Smith Act for the purpose of punishment.

Punishment for the offense charged is not listed in the Table of Maximum Punishments. When the offense is not so listed and it is not included within or closely related to a listed offense, it may be punished as authorized by the United States Code, or the Code of the District of Columbia, whichever is lesser, or by the custom of the service. Manual, supra, paragraph 127c, page 214. Were it not for this provision, punishment for a violation of Article 134 is "at the discretion" of the court-martial. See also: Article 56, Uniform Code of Military Justice, 50 USC § 637.

Under the United States Constitution, Congress is empowered to raise and maintain the armed forces and to make.

rules and regulations for its government. United States Constitution, Article I, section 8. The President is designated as the Commander-in-Chief. Ibid, Article II, section 2. These branches of our Government, therefore, have a more direct and profound relationship to service personnel than to non-military persons. Consequently, the armed forces have a special trust with respect to the Government. This trust demands unqualified loyalty. Giving aid and encouragement to an organization which advocates the violent overthrow of the Government is a patent violation of the trust. It is conduct of a most reprehensible nature. It shocks reason and conscience to imply that such conduct is punishable only as a simple disorder.

An organization dedicated to the overthrow of our Government by force and violence is an ever present threat to its security. In a very real sense, the members of such an organization are enemies of the Government and the people. Certainly, if advocacy matures into active force, they are actual enemies. However, the danger is there, although the Putsch has not begun. Dennis v. United States, supra. It would not, therefore, be unreasonable to describe the offense here as "closely related" to that of aiding the enemy. See Article 104, Uniform Code of Military Justice, 50 USC § 698. No limits are imposed upon punishment for the latter offense. Manual, supra, paragraph 127 c, page 222. However, we need not go that far. We are satisfied that reference to the Smith Act for the purpose of assessing punishment is entirely proper.

The evil against which the Smith Act protects is essentially the same as the evil inherent in the accused's conduct. There being no related provision in the Code of the District of Columbia, it provides, as authorized by the Manual, an appropriate frame of reference for judging the seriousness of the offense charged, and for measuring the punishment.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.