UNITED STATES, Appellant

v

THOMAS W. EKENSTAM, Commissaryman Third Class; ARTHUR E. BECHTEL, Seaman Apprentice; WILLIE (n) HALL, JR., Seaman; THOMAS A. KING, Seaman Apprentice; and DENNIS A. REYNOLDS, Seaman, U. S. Navy, Appellees

7 USCMA 168, 21 CMR 294

Nos. 7575, 7576, 7577, 7578, 7579

Decided June 22, 1956

*Lieutenant (jg) Mitchell W. Rabbino* argued the cause for Appellant, United States.

*Lieutenant (jg) W. W. McNeilly, Jr.,* argued the cause for Appellees, Accused. With him on the brief was *Commander James A. Brough.*

### Opinion of the Court

ROBERT E. QUINN, Chief Judge: · Each accused was separately tried and convicted for violations of Article 134, Uniform Code of Military Justice,

50 USC § 728. Except for the difference in time and place, all the specifications are the same. Representative is the following specification taken from the Ekenstam case:

"Specification 1: In that Thomas W. Ekenstam, commissaryman third class, U. S. Navy, U. S. Naval Communication Facility, Yokosuka, Japan, then seaman, did, on or about 10 February 1954, at or near Camp Zama, Japan, violate Article XV of the Administrative Agreement between the United States of America and Japan dated 28 February 1952, by purchasing golf clubs and golf equipment of a value of about $104.00 from the Camp Zama Golf Course, Camp Zama, Japan, a nonappropriated fund organization, authorized and regulated by the U. S. military authorities, and disposing of same in Japan, to Yasuo Kasatani, alias Tommy, a person not authorized to purchase from the said Camp Zama Golf Course."

In each case, the accused entered a plea of guilty and the court-martial imposed a sentence which included a bad-conduct discharge. A board of review set aside the findings of guilty and dismissed the charges on the ground that the specifications failed to allege an offense. A majority of the board of review construed the provisions of the Administrative Agreement set out in the specification as binding only upon the Governments of the United States and Japan and as without penal force in regard to individuals subject to their authority. The Judge Advocate General of the Navy forwarded the cases to this Court. He requested that we determine whether each of the specifications alleges an offense under the Uniform Code of Military Justice. Since the question in each case is the same, the Government moved for an order consolidating the cases for the purposes of the appeal. We granted the motion.

Simultaneously with the Treaty of Peace, the United States and Japan entered into a Security Treaty. 3 US Treaties 3329, et seq. Under the terms of the latter, Japan granted and the United States accepted the right to dispose certain of its armed forces in and about Japan for the security of Japan and the maintenance of international peace in the Far East. Article III of the Treaty reads as follows:

"The conditions which shall govern the disposition of armed forces of the United States of America in and about Japan shall be determined by administrative agreements between the two Governments."

On February 28, 1952, an Administrative Agreement implementing the Article was signed in Toyko by the representatives of the two Governments. Article XV of the Administrative Agreement reads as follows:

"1. (a) Navy exchanges, post exchanges, messes, social clubs, theaters, newspapers and other nonappropriated fund organizations authorized and regulated by the United States military authorities may be established in the facilities and areas in use by the United States armed forces for the use of members of such forces, the civilian component, and their dependents. Except as otherwise provided in this Agreement, such organizations shall not be subject to Japanese regulations, license, fees, taxes or similar controls.

• • • • •

"2. No Japanese tax shall be imposed on sales of merchandise and services by such organizations, except as provided in paragraph 1(b), but purchases within Japan of merchandise and supplies by such organizations shall be subject to Japanese taxes.

"3. Except as such disposal may be authorized by the United States and Japanese authorities in accordance with mutually agreed conditions, goods which are sold by such organizations shall not be disposed of in Japan to persons not authorized to make purchases from such organizations.

"4. The obligations for the withholding and payment of income tax and of social security contributions, and, except as may otherwise be

mutually agreed, the conditions of employment and work, such as those relating to wages and supplementary payments, the conditions for the protection of workers, and the rights of workers concerning labor relations shall be those laid down by the legislation of Japan.

"5. The organizations referred to in this Article shall provide such information to the Japanese authorities as is required by Japanese tax legislation."

In our opinion, the Administrative Agreement is intended to define the rights and obligations of ▉ the signatory Governments, not to prescribe the conduct of individuals or organizations subject to their authority. See The Over The Top, 5 F2d 838, 845 (D Conn) (1925); Oppenheim's International Law, Lauterpacht's 8th ed, § 520, page 924. However, even if the Administrative Agreement were to be so construed, Article XV applies to organizations, not to persons; consequently, that article does not prohibit the conduct alleged in the specifications.

It is well settled that an incorrect designation of a statute or regulation violated by the accused ▉ does not invalidate the specification of a charge. If the conduct is proscribed by another regulation and no "additional or different principle of law is required to support the conviction; and the accused has no burden of defense which he did not have at the trial," he is not harmed by the incorrect designation. United States v Blevens, 5 USCMA 480, 485, 18 CMR 104. Several other regulations have been referred to as bearing on the subject matter. Additionally, Government appellate counsel argue that Navy custom prohibits the acts set out in the specifications. Only two of the regulations have direct pertinency; one is a local order by the commanding officer of the accused's organization and the other is a Far East Command general order. Both of these, however, permit defenses which would not have been available to the accused under the Administrative Agreement. As for the

custom relied upon by Government counsel, it is obvious that there is also a material difference between preparing a defense against an alleged custom and a defense against a statute. Accordingly, it would deprive the accused of a substantial right if the specifications were sustained upon the basis of a different regulation or custom.

The certified question is answered in the negative. The decision of the board of review is affirmed.

LATIMER, Judge (concurring in the result):

I concur in the result.

A divided board of review has furnished us with carefully considered and well-presented arguments to support both sides of this controversy. In addition, excellent briefs have been filed by both parties. As a result of those efforts, it is possible for us to reduce the number of relevant issues to two. They are, however, of sufficient importance to justify thoughtful consideration.

The first question to be considered is whether the Administrative Agreement covers the sale and disposal ▉ of property by individuals. In order to determine its scope and import, I turn to the wording of the preamble. There I find the following:

"Whereas the United States of America and Japan on September 8, 1951, signed a Security Treaty which contains provisions for the disposition of United States land, air and sea forces in and about Japan;

"And whereas Article III of that Treaty states that the conditions which shall govern the disposition of the armed forces of the United States in and about Japan shall be determined by administrative agreements between the two Governments;

"And whereas the United States of America and Japan are desirous of concluding practical administrative arrangements which will give effect to their respective obligations under the Security Treaty and will strengthen the close bonds of mutual interest

**171**

and regard between their two peoples;

"Therefore, the Governments of the United States of America and of Japan have entered into this Agreement in terms as set forth below: . . . ."

As I interpret the language used, the Agreement is intended primarily to fix with certainty the practical administrative arrangements previously agreed upon between the two contracting countries. Therefore, unless it can clearly be extended in its operation to citizens of the United States, including these accused, and thereby place on them a duty to refrain from violating any of its provisions, these convictions must be set aside.

With that as a starting point, I move on to consider the article of particular importance in this case. It is Article XV and insofar as relevant to the issues, it provides:

"1. (a) Navy exchanges, post exchanges, messes, social clubs, theaters, newspapers and other non-appropriated fund organizations authorized and regulated by the United States military authorities may be established in the facilities and areas in use by the United States armed forces for the use of members of such forces, the civilian component, and their dependents. Except as otherwise provided in this Agreement, such organizations shall not be subject to Japanese regulations, license, fees, taxes or similar controls.

* * * * *

"3. Except as such disposal may be authorized by the United States and Japanese authorities in accordance with mutually agreed conditions, goods which are sold by such organizations shall not be disposed of in Japan to persons not authorized to make purchases from such organizations.

* * * * *

"5. The organizations referred to in this Article shall provide such information to the Japanese authorities as is required by Japanese tax legislation."

Narrowing further the issue, I proceed to the heart of the controversy. The parties to this trial are divided over the interpretation to be placed on paragraph 3 above, and, as quite often happens, they both use the same rule of construction to support their position. This rule is set out in Hackworth, Digest of International Law, § 493, and I quote his language:

"Words and phrases in treaties are to be given their usual meaning unless a contrary purpose is evinced by the context of the treaty of other evidence. A reasonable, as distinguished from a restricted or technical, construction is the usual practice. All words of the treaty are, if reasonably possible, to be given a meaning, and rules of construction may not be resorted to in order to render them meaningless."

In applying the above-quoted rule to the facts of this case, the accused contend that the phrase "goods which are sold by such organizations shall not be disposed of in Japan to persons not authorized to make purchases from such organizations" must be interpreted to apply only to nonappropriated fund organizations. On the other hand, the Government insists that the phrase must be construed as a proscription against unauthorized sales by both nonappropriated fund organizations and those persons subject to the Code who purchase therefrom.

I support the contention advanced by the accused. In interpreting the critical paragraph I am impressed by the absence of any prohibition directed particularly toward purchasers from nonappropriated fund organizations. The whole Article is worded in such a way as to disclose that organizations, not individuals, were given primary consideration. The first paragraph authorizes their establishment and limits their location. It goes on to provide that they will not be subject to Japanese regulations, license, taxes or control. Most assuredly those provisions are not intended to embrace persons. Paragraph 3 seems to be no more than a limitation placed upon the agencies dealt with in the previous paragraphs. When the

172

Article is considered in its true relationship with all parts of the Agreement, it appears to me to say that those organizations which are maintained for the benefit of the United States Armed Forces, and which are not required to contribute to the support of the local government, shall not enter into competition with other taxpaying businesses by selling their goods, wares and merchandise on the open market. Had the United States Government, as one contracting party, sought to make the contract broad enough to cover the resale of merchandise purchased from the exempted activities, it would have been a very simple task to have so stated. Undoubtedly the Agreement is silent because the draftsmen contemplated that the usual orders, circulars and directives would be issued by the various departments of the respective Governments, and that it was not necessary to make the administrative document a wholly self-executing instrument.

Article XV should not be considered as an isolated portion of the Administrative Agreement, but as part and parcel of a complete contract. All parts should be construed with reference to each other, and in construing this particular paragraph, I believe it logical to assume that the parties intended to be consistent in their use of words and phrases. Therefore, if third parties are specifically mentioned in certain provisions and omitted in others, I would conclude that the enumeration was deliberate and for the purpose of having the provisions applied differently. It is to be remembered that the Government is seeking to make a criminal statute out of Article XV, and assuming it reaches that level, a penal law ought not to be extended to persons or acts not within its descriptive terms or the fair and clear import of the language used. There are several Articles in the Agreement which cast some light on my conclusion that Article XV does not create a crime.

Article XI covers customs procedures, taxes and exemptions. Generally speaking, it provides exemptions for materials, supplies, and equipment imported by the United States armed forces. It, however, goes further, and in paragraph 3 provides that property consigned to and for the personal use of members of the United States armed forces, the civilian component, and their dependents, shall be subject to customs duties and other such charges, except that no duties or charges shall be paid with respect to certain enumerated personal property, particularly furniture, household goods, clothing and automobiles for private use. It is to be noted that in that Article the contracting parties deal specifically with both nonappropriated fund organizations and individuals, and for good reason. There the individual is granted particular benefits or privileges, and with those go corresponding obligations.

Paragraph 6 of Article XI contains substantially the same exception as paragraph 3 of Article XV for it provides:

"Except as such disposal may be authorized by the Japanese and United States authorities in accordance with mutually agreed conditions, goods imported into Japan free of duty shall not be disposed of in Japan to persons not entitled to import such goods free of duty."

Under that paragraph, I would conclude that the contracting parties clearly intended to impose on those who took advantage of the right to import property free of duty the obligation not to sell the property in Japan. But obviously the inclusion of third persons is clearly within the terms used. In addition, it is interesting to note that paragraph 8 of that Article provides:

"The United States armed forces, in cooperation with Japanese authorities, shall take such steps as are necessary to prevent abuse of privileges granted to the United States armed forces, members of such forces, the civilian component, and their dependents in accordance with their Article."

The language of that paragraph speaks out clearly to the effect that individuals may violate the Agreement, for it provides that the United States armed forces, in cooperation with Japanese authorities, shall take any

necessary action to prevent abuse of the privileges granted to members of such forces, the civilian component, and their dependents. Its extension to individuals becomes more certain when consideration is given to the further requirement that, in order to prevent offenses against custom, laws and regulations by any member of the above-enumerated classes, the United States armed forces must render all assistance within their power to insure the payment of duties, taxes, and penalties payable by members of such forces, or of the civilian component, or their dependents.

Again, in Article XII of the Agreement, the two contracting Governments agree that the United States shall have the right to obtain material, supplies, and equipment, exempt from certain Japanese taxes. That Article also mentions individuals as it provides that "Neither members of the United States armed forces, civilian component, nor their dependents, shall by reason of this Article enjoy any exemption from taxes or similar charges." ·Paragraph 8 of the Article goes on to state:

"Except as such disposal may be authorized by the Japanese and United States authorities in accordance with mutually agreed conditions, goods purchased in Japan exempt from the taxes referred to in paragraph 3, shall not be disposed of in Japan to persons not entitled to purchase such goods exempt from such tax."

In this instance third parties are mentioned only for the purpose of making certain that they acquire no privileges or benefits. Therefore, the prohibition against resale seems to me to run only against property lawfully acquired by the United States Government or its agencies.

Returning to Article XV and considering it in the light of the other provisions of the Agreement, I find it does not specifically grant privileges to, or fix duties on, members of the United States armed forces, the civilian component, or their dependents. It deals entirely with the establishment of exchanges, messes, social clubs, theaters,

**174**

newspapers and other nonappropriated fund organizations. Those organizations are granted tax free privileges and they are not shackled with Japanese regulations. They are required to furnish information on such matters as sales taxes, conditions of employment, and other matters, and they are obligated to comply with Japanese tax legislation in certain fields. If there are any penal sanctions created by this Article, the punishment ought to be directed toward those organizations who are permitted to operate under the preferred conditions set out in the Agreement. Throughout the Article only those nonappropriated fund activities which are the beneficiaries of the Agreement are mentioned, and I am not disposed to construe its provisions to extend to enumerated classes of persons. As to post exchanges, messes and other organizations, the contract may be self-executing—a matter I need not decide —but any penal consequences of the violation of the paragraph cannot be extended to purchasers from those activities. They can only be reached by implementing regulations.

The second question brings into issue the sufficiency of the specification to allege an offense under some other law, punitive article or regulation. We have on previous occasions held that a misdesignation of a statute in a specification is not fatal if the facts alleged fully state an offense. In United States v Long, 2 USCMA 60, 6 CMR 60, we stated:

"Our holding on the first contention requires that we dispose of an ancillary assertion concerning the legal effect of alleging the offense as a violation of the Federal statute. As previously indicated, an offense under Article 134, Uniform Code of Military Justice, supra, is proven without regard to whether a summary court is included within the terms of that statute. By the same reasoning, an offense may be alleged under clause (1) of Article 134 without the necessity of relying on the violation of a particular statute. The phrase in the specification which states 'violate Title 18, Section 241, United States Code (March 4, 1909, Chapter

321, Section 135, 35 Statutes 1113; June 8, 1945, Chapter 178, Section 1; 59 Statutes 234), as amended by Section 1503, Chapter 73, Supplement IV to the 1946 code, a statute of the United States of America,' may be deleted and a substantive offense contrary to Article 134 is sufficiently alleged. The quoted clause may, therefore, be considered redundant and unnecessary."

The principle therein announced has been reaffirmed in United States v Deller, 3 USCMA 409, 12 CMR 165, and United States v Blevens, 5 USCMA 480, 18 CMR 104. However, we have required the presence of certain conditions before we have applied the rule. One of those conditions is that the accused must have had a fair opportunity to defend against the charge as amended, and the amendment must not work a material change in the issues of the case. Because the accused in this case entered pleas of guilty, we cannot invoke the principle if we place them in a situation where they have never been afforded an opportunity to meet a possible factual dispute. In my view, an affirmance under some other punitive article of the Code, or under a different theory of the same article used at trial, would present more than a fair risk that such a procedure will prejudice these accused.

It has been suggested that we could affirm a conviction under a theory that the acts committed were ▬▬▬▬ violations of letters or circulars of the Far East Command, or subordinate naval commands, or that they amounted to a breach of a custom of the service. The difficulty with proceeding on that basis is that certain facts not needed to support the present findings would become necessary to substantiate the offense alleged in the modified specification and the accused might elect to defend against them. By way of illustration, in the event we were to give thought to affirming the conviction as a violation of one of the appropriate naval regulations, we would be required to consider knowledge as an essential element of the offense. That would be strange indeed, for the Government—for a very doubtful reason—rejected that theory prior to trial because one of the reviewing legal officers concluded that ingredient could not be proven. Regardless of the soundness of that reason, the accused might have elected to defend on that ground had it been alleged at trial. Were we to select other general regulations brought to our attention, we would find that they provide that property may properly be sold if held for a certain period of time, and there is nothing in the present record to indicate whether the accused could bring themselves within the exception. Other objections to the proposed affirmance could be mentioned, but it is not necessary to do so, for in order for us to proceed on any such theory, we would be required to change the designation of the punitive article, delete part of the specification, and substitute therefor language which would change substantially the issues involved. In such an event, the accused would be denied a fair opportunity to defend against an offense newly pleaded.

For the foregoing reasons, I concur in affirming the decision of the board of review.

Judge FERGUSON did not participate in the decision in this case.