UNITED STATES, Appellee

v

NATHANIEL W. DOZIER, Master Sergeant, U. S. Army, Appellant

9 USCMA 443, 26 CMR 223

No. 9892

Decided July 11, 1958

*Major Edward Fenig* argued the cause for Appellant, Accused.

*First Lieutenant Chester F. Relyea* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Major Thomas J. Nichols.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Master Sergeant Nathaniel W. Dozier was tried and convicted by general court-martial convened at Oxon, England, of several offenses. Those pertinent to this appeal include possession of a number of unauthorized ration cards, a violation of Article 92, Uniform Code of Military Justice, 10 USC § 892, and eight specifications alleging the forgery of ration cards, in violation of Article 123 of the Code, supra, 10 USC § 923. Also convicted of similar charges, but at a separate trial, was Sergeant Henry A. Smart. Before the board of review, several issues were assigned by appellate defense counsel on behalf of each accused. The major contention of each was that the ration cards were not a proper subject of forgery. The Government, however, urged that, assuming *arguendo* the accused were not guilty of forgery, their acts were clearly in contravention of Article 134 of the Code, supra, 10 USC § 934.

The board of review spent a considerable portion of its opinion (United States v Smart, 23 CMR 454) discussing whether ration cards were the subject of forgery. It noted that "A forged ration card, by the use of which the forger purchases and pays in full for the rationed items, does not defraud the USAFE Exchange of anything of value without compensation." It concluded that use of forged ration cards interfered with, or impaired, a governmental function. Consequently, it held that the "problem," viz, whether or not forged ration cards were the proper subject of forgery, was merely of "academic interest." It also determined that each specification alleged a violation of 18 USC § 1001,[1] as a charge under Article 134 of the Uniform Code, supra.

It is well settled that if a specification framed as a violation of a particular Article states facts showing a violation of another Article, the conviction may be sustained under the latter Article if the accused is not thereby misled. United States v Olson, 7 USCMA 460, 22 CMR 250; United States v O'Neil, 3 USCMA 416, 12 CMR

[1] "§ 1001. Statements or entries generally

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 749."

172. The problem, however, is the applicability of that principle to the facts of this case. That problem has two aspects. The first is whether the specification alleges a violation of § 1001, supra. If it does, then the second consideration is whether the accused was prejudiced at the board of review level by substitution of the Article under which the charge is laid.

Typical of the eight forgery specifications of which the accused was found guilty is the following:

> "In that Master Sergeant Nathaniel W. Dozier, US Army . . . did, . . . with intent to defraud, falsely make the signature of Captain Ira W. Blackwell to a certain instrument, to wit: USAFE Special Activities Permit and Ration Card, Serial Number B 063916 . . . which said instrument would, if genuine, apparently operate to the legal prejudice of another."

We first consider whether this specification sufficiently alleges conduct violative of 18 USC § 1001, as held by the board of review.

Section 1001 proscribes the making of any "false, fictitious or fraudulent statement" in a matter within the jurisdiction of any department or agency of the United States. The materiality of the representation must be established. Freidus v United States, 223 F2d 598 (CA DC Cir) (1955). It is not clear whether materiality must also be alleged in the indictment. See United States v Larocca, 245 F2d 196 (CA 3d Cir) (1957); Weinstock v United States, 231 F2d 699, 701, 705 (CA DC Cir) (1956). Moreover, materiality is a substantial matter of which the accused was not apprised by the original designation of the statute allegedly violated. These circumstances cast serious doubt on the correctness of affirming the conviction as a violation of § 1001. See United States v Ekenstam, 7 USCMA 168, 21 CMR 294. We need not, however, resolve that doubt. An unquestioned obstacle to affirmance appears in the instructions.

In United States v Addye, 7 USCMA 643, 23 CMR 107, the accused was charged with forging a letter requesting partial pay. The law officer, after instructing on the essential elements of forgery, advised the court that it was enough "'*if the acts charged tend to impair or impede a governmental function.*' (Emphasis supplied.)" We held such an instruction prejudicially erroneous since Article 123 of the Code, supra, requires that the instrument have apparent efficiency to affect a legal right of another and impairing or impending a governmental function is not the same as affecting a legal right. We reversed the accused's conviction because the instructions provided the court-martial with an incorrect use of law for guidance in its deliberations on the accused's guilt or innocence.

Under § 1001 it is an offense for anyone to do any fraudulent act which is calculated to or does "obstruct or impair governmental agencies and/or the value of their operations, documents and reports." United States v Myers, 131 F Supp 525 (ND Cal) (1955). There can, of course, be no perversion of a governmental function from a false statement "that was incapable of affecting or influencing such function." Freidus v United States, supra. The question of whether particular conduct engaged in by an accused obstructs or impairs a governmental function must, in the final analysis, rest with the triers of fact. At no point in instructions was this issue submitted to the court-martial. A finding that a false writing affects the legal rights of a particular person is not the same as a finding that the writing has perverted the operations of a governmental function. United States v Addye, supra. In this respect the accused was prejudiced. We conclude, therefore, that the board of review erred in affirming the accused's conviction of specifications 1 through 8, Charge III, as violations of 18 USC § 1001.

The remaining issue concerns the applicability of Footnote 5[2] to the speci-

---

[2] Footnote 5 of the Table of Maximum Punishments, Section A, paragraph 127*c*, Manual for Courts-Martial,

fication of Charge I which alleged a violation of a Brigade Memorandum[3] prohibiting possession of unauthorized ration cards for the purpose of using them in the purchase of controlled items.[4] If the Footnote is applicable, the offense may only be punished as a disorder with an authorized maximum sentence not to exceed confinement at hard labor for four months and partial forfeitures of two-thirds pay per month for a like period; whereas, if the Footnote is inapplicable, the maximum sentence for the offense may extend to dishonorable discharge, total forfeitures and confinement at hard labor for two years. We believe the Footnote applies in the instant case and that the maximum punishment for the offense is limited to that made punishable by the Uniform Code as a disorder. United States v Hammock, 8 USCMA 245, 24 CMR 55; United States v Alberico, 7 USCMA 757, 23 CMR 221; United States v Tamas, 6 USCMA 502, 20 CMR 218.

The decision of the board of review as to specifications 1 through 8 of Charge III is reversed and the sentence is set aside. The record of trial is returned to The Judge Advocate General of the Army for submission to the board of review for further proceedings consistent with this opinion.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

To return this case to the board of review will serve no useful end. For all purposes necessary to this appeal that body expressed its opinion on the question of whether ration cards are the subject of forgery when it wrote in a companion case:

> ". . . A forged ration card, by the use of which the forger purchases and pays in full for the rationed items, does not defraud the USAFE Exchange of anything of value without compensation. It does interfere with or impair the exercise of a governmental function, but the government has conceded, in this case, that the impairment of a governmental function is not sufficient to meet the test of forgery under Article 123." [United States v Smart, 23 CMR 454.]

Because it did not base its decision in the instant case directly upon such a holding is of no moment, for unquestionably this Court is empowered to correct all matters of law which have been accorded final action by boards of review. Article 67(d), Uniform Code of Military Justice, 10 USC § 867; United States v Zimmerman, 2 USCMA 12, 6 CMR 12; United States v Benson,

---

supra, provides that punishment for violating a lawful general regulation pursuant to Article 92 of the Code, supra, does not apply in those cases wherein the accused "is found guilty of an offense which, although involving a failure to obey a lawful order, is specifically listed elsewhere in this table."

[3] Memorandum Number 7, Headquarters, 32d Antiaircraft Artillery Brigade, dated February 10, 1956, entitled "Regulated Activities and Transactions."

[4] Paragraph 4f2 of the regulation referred to in the specification states the following:

"f. *Regulated and Prohibited Transactions*:

. . . . . .

(2) *Ration Cards*: Exchange Ration and Luxury Ration Cards, Class VI Ration Cards and Commissary Cards, are issued to members of this command and their dependents solely to enable them to purchase controlled items. The lending, giving, selling, transferring, delivery of possession or bartering in any manner of these cards or of the coupons attached thereto (except to authorized dependents of the person to whom issued) is prohibited. No person subject to this Memorandum will have such cards or coupons in his possession for the purpose of using them in the purchase of controlled items unless they shall have been duly issued to him or his authorized dependents. Exchange Ration and Luxury Ration Cards, Class VI Ration Cards and Commissary Cards will not be used as identification cards, and will not be pledged as security in any transaction with anyone."

3 USCMA 351, 12 CMR 107. It can only interfere with the orderly administration of military justice for us to refuse to terminate litigation by deciding an issue when it is before us properly. Deferring a decision helps neither the accused, the board of review nor the system. For that and other reasons I file this dissent.

It is a general proposition of law that when an accused seeks to set aside his conviction, he must establish that it is not legally sustainable. Forgery is forgery by whatever name described if, having been properly alleged, its elements are found on legal evidence. The touchstone of the determination then lies in the facts alleged and found, and in this instance there is no question about the pleadings and the board accepted the facts in the record.

If this accused is guilty of any offense under the Code which was tried fairly by the court-martial, then we should be unconcerned about which particular Article of the Code the intermediate appellate agency chose as the base for its affirmance. United States v Deller, 3 USCMA 409, 12 CMR 165. Accordingly, I feel free to discuss the crime of forgery. Article 123, Uniform Code of Military Justice, 10 USC § 923, defines that crime as follows:

> "Any person subject to this chapter who, with intent to defraud—
>
> (1) falsely makes or alters any signature to, or any part of, any writing which would, if genuine, apparently impose a legal liability on another or change his legal right or liability to his prejudice; or
>
> (2) utters, offers, issues, or transfers such a writing, known by him to to be so made or altered;
>
> is guilty of forgery and shall be punished as a court-martial may direct."

The only element of forgery which was not specifically affirmed by the board of review was the apparent capability of the document, if genuine, to impose a legal liability on another or change his legal right or liability to his prejudice. The board advanced certain legal arguments for and against that proposition but reached no decision. The reason for leaving the hypothesis unsettled may be found in the rationale of a companion case, United States v Smart, supra, which the board applied in this instance. After mentioning the various principles, they said:

> "Any further discussion of the above problem is of any academic interest in this case inasmuch as the facts pleaded in the specifications under Charge III are a violation of the following Act of Congress:"

The accused first seems to assert that to justify a conviction for forgery the person whose legal right or liability might be affected must be named in the specification. I do not believe that to be the law, for under the Code provision and in line with present-day pleadings, the person intended to be defrauded need not be identified. While the proof must show an intent to defraud, it need only show that if the document was genuine it would apparently change the legal liability of someone. Here that showing is made.

Accused's second contention goes right to the heart of the problem for he vigorously asserts that the facts do not establish the crime of forgery. However, I cannot follow his reasoning. The damage arising out of a forgery may injure a person in his personal as well as property rights. United States v Strand, 6 USCMA 297, 20 CMR 13. Further, the injury is not limited to pecuniary losses. In this case, cigarettes were being issued to military personnel stationed in England. That country had the right to impose conditions on their sale and the United States Government and its agency, the Air Force Exchange, had a duty to respect those conditions. Such matters as custom duties, taxes and limitations on resale were necessarily involved in the sale and delivery of goods being dispensed by agencies of the United States. Ration cards are needed to control the unauthorized possession of items which are in short supply or which involve exemption from taxes or injury to the markets of the host country. In this instance, I suspect that the supply of

cigarettes was adequate, so the potentiality for harm to the English tax and market structure must have dictated the need for control. It takes little imagination to understand that the wholesale issue of tax-free cigarettes to American military personnel would nurture black-market operations and prejudice the local trade. Also, it is easily foreseeable that if the supply were to become short those individuals who carried and used forged ration cards would get far more than their fair share of the items and the innocent holder would suffer. The Government, in order to fulfill its obligations to the host country and to its many service personnel stationed there, must issue certain items in a limited way and only to those who hold bona fide cards. Here, the person named on the card could not receive cigarettes from the post exchange unless he satisfied a legal condition, i. e., presentation of a valid ration card. Furthermore, the exchange could not issue the items unless it was presented with bona fide evidence of a right to purchase. Therefore, a forged document changes the liabilities of the Government and the rights of the forger.

In United States v Addye, 7 USCMA 643, 23 CMR 107, the Chief Judge discussed the offense of forgery involving a letter requesting partial payment. His language has significant bearing upon the facts alleged in the instant case, for it shows forgery will lie when the holder obtains a benefit he would not otherwise enjoy:

> ". . . Clearly then, a letter of approval for a partial payment confers upon the holder a legal benefit he would not otherwise have. True, the fiscal officer is not bound to honor the request. Without it, however, the applicant for partial pay has absolutely no standing. The letter, therefore, is not a mere request for a courtesy, but evidence of the satisfaction of a legal condition. It is an instrument which 'perfects' the accused's legal right to partial payment in advance of the time he would ordinarily be entitled to pay."

In United States v Rubenstein, 7 USCMA 523, 22 CMR 313, we were confronted with a somewhat similar problem. There the accused obtained whiskey tax free and although he paid the seller the full price, we held he had committed the crime of larceny. In that instance, we sought to show that certain intangible rights might be jeopardized by the conduct of an accused in dealing with a controlled product. The following quotation expresses our views:

> ". . . In selling whiskey in Japan, Barclay & Company bargained for more than the mere purchase price. It was permitted to transact business in that area under strict restrictions imposed by the Supreme Commander Allied Powers, and it bargained for lawful transactions which would not jeopardize its privilege to do business in Japan. There is a close parallel between the facts of this case and those found in the case last discussed above. There the druggist bargained for a genuine prescription when he sold the narcotics, as well as their purchase price. Here the Company contracted for valid requisitions as part of the consideration for the sale of its whiskey. Its privilege to do business was subject to immediate cancellation if it engaged in questionable transactions, and there was no escape clause in its permit to the effect that unless sales to unauthorized persons were knowingly made the license would not be revoked."

The question, therefore, is not whether the vendor received payment for the goods delivered, but rather, would the goods have been sold if the true facts had been known? The answer obviously is in the negative. In the case at bar, the very purpose of issuing bona fide documents was to limit the quantity that could be purchased by one person and his dependents. In that way control could be maintained over members of the Armed Services who would otherwise be free to use an uncontrolled distribution to the detriment of the host country. The accused sought to and did mislead the Exchange to the prejudice of the United States

Government. If it were to stand by and permit the issuance of excessive numbers of ration cards they would become the tools of black-marketeers and there might be serious international repercussions. Certainly, it is reasonable to assume that England would, with justification, claim a breach of certain contractual conditions on the part of our Government if its agency was issuing cigarettes far in excess of the needs of the American population there. Had such superfluous cards been genuinely issued by the appropriate commander, it appears to me that the host country would have had a legitimate complaint that the United States was not complying with its treaty obligations. See Agreement Regarding Status of Forces of Parties to the North Atlantic Treaty, Articles XI, XII, § 1.

While the foregoing is sufficient to support the charge of forgery, it should be apparent that the United States would not be the only party to suffer a legal liability had the ration cards been genuine. If I assume the validity of those cards possessed by the accused, their very existence would be sufficient to support a charge of neglect of duty on the part of the officer issuing or validating such cards—in this case the unit commanders whose names were forged by the accused and who were named in the specifications. See Article 92(3), Uniform Code of Military Justice, 10 USC § 892, proscribing dereliction of duty. For unit commanders to issue ration cards far in excess of their unit strength, when they know the item to be obtained is in great demand by local citizens, is inviting trouble. I am sure that if they willfully or negligently permitted excessive cards to get into circulation, they could expect disciplinary measures to be taken against them. For the foregoing reasons, I would find against the accused on this issue.

The previous development marks out my holding on footnote 5. Paragraph 127*c*, Section A, Manual for Courts-Martial, United States, 1951. Forged ration cards can be part of the tools of those who traffic in the black-market, and the seriousness of violations of regulations aimed at preventing that form of activity must be considered in ascertaining the appropriate punishment. Federal statutes proscribing the possession of bogus ration documents carry severe penalties. United States v Davis, 328 US 582, 66 S Ct 1256, 90 L ed 1453 (1946). As I pointed out in my dissenting opinion in United States v Hammock, 8 USCMA 245, 24 CMR 55:

> ". . . Undoubtedly, the reason for promulgating the regulation was to discourage the possession of the tools which make black-marketing activities in foreign countries a matter of ease. When American servicemen are stationed overseas and are able to obtain American made goods which are in short supply in the host country, and resell them through illicit channels, the potentialities for harm to the military services and to the United States Government are great. Undercover diversion of personal property to foreign nationals tends to interfere with the economic system of foreign governments and bring discredit on the United States. Therefore, violation of regulations intended to discourage participation by members of the armed services in those activities should be punished more severely than a mere disorder.
>
> "I would conclude that, under the circumstances of this case, the serious aspect of the crime is the violation of the order, . . ."

Furthermore, in United States v Tamas, 6 USCMA 502, 20 CMR 218, we indicated our belief that possession of ration cards with intent to deceive would be more than a disorder. I quote from our language in that instance:

> "In this case, the accused was apprehended in connection with another offense and searched. Two ration books in his name were found on his person, and he admitted that one of them was a forgery. But there is nothing to indicate that he ever used the false book in any way. The book itself speaks to the contrary, for no coupons had been removed therefrom, even though it purportedly had been

issued some six weeks prior to the apprehension. It was not the kind of instrument which normally could be used for identification, and the record is devoid of a showing of any exceptional circumstances. We must not be understood as holding that the accused must be caught in the very act of using the false instrument to make out an intent to deceive as such an intent may be shown in many ways. But here, there is no evidence of anything other than a simple wrongful possession, and for the crime alleged, that is not enough.

"Because the evidence is insufficient to establish an intent to deceive, under this specification we may properly affirm only the disorder of wrongfully possessing a false ration book, punishable by not more than four months' confinement."

What was envisaged there is present here. Moreover, this particular offense may be equated to the possession of a false pass with intent to deceive and in the Table of Maximum Punishments that offense carries a maximum penalty of three years. This is in excess of the limit used under Article 92 and the accused was therefore not prejudiced.

I would affirm the decision of the board of review.