UNITED STATES, Appellee

v

LAWRENCE O. STRAND, JR., Private First Class (alias Robert
D. Lonon), U. S. Marine Corps, Appellant

6 USCMA 297, 20 CMR 13

298

No. 5996

Decided September 2, 1955

*Commander Earl C. Collins*, USN, argued the cause for Appellant, Accused.

*Major Charles B. Guy*, USMC, argued the cause for Appellee, United States.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This is a strange case for the United States Court of Military Appeals. Primarily it concerns two young people who, with sufficient ceremony but with too little thought, rushed into a "weekend marriage." The period of repentance for the husband, the accused, lasted about ten days. What he did to express his repentance became the basis for his conviction by a general court-martial on charges of forgery, using the mails to defraud, and conduct to the prejudice of good order and discipline. Important questions of military law are raised in connection with the sufficiency of the allegations of the forgery charge and the legal correctness of certain procedure at the trial.

Corporal J. Highley and his fiancee were scheduled to be married on January 23, 1954, in Reno, Nevada. The accused was to act as best man. A girl friend of his was to complete the bridal party. However, she got "fouled up" on the date and was not available. At the "last minute" the accused telephoned Patricia, a girl whom he knew for about four months. Patricia knew the accused only as "Lon." Nevertheless she persuaded him to propose marriage. He did, and she accepted.

On the night of January 22, the bridal party left California for Reno. En route, the accused "realized that . . . [he] had stuck . . . [his] foot in it." But, he decided to say

nothing and to go through with the arrangements. The next morning the accused and Patricia were married in a double ceremony with Corporal Highley and his fiancee.

Besides concealing from his bride his misgivings about the marriage, the accused also concealed his true name from her. He married her in the name of Robert D. Lonon. He further told her that the marriage would have to be kept secret. He had been selected for Naval Aviation Cadet training and his eligibility depended upon his continued status as an homme sole. Patricia accepted the condition of silence. Consequently, when she and the accused returned to her home on Sunday, January 24, the accused left her at the door.

The next meeting between the accused and Patricia was on Thursday night, January 28, at her friend's home. A day or two later, the accused drafted a letter to Patricia, but did not send it. On February 2, he received orders transferring him from Moffett Field, California, to Pensacola, Florida, for processing, as a Naval Aviation Cadet. The next day he asked a Sergeant Trujillo to sign the letter which he had previously prepared. It reads as follows:

"NAVAL SPEED LETTER
Unclassified
VA-64-rd
244-P
3 February 1954

Mrs. Robert D. Lonon
28 Delong
Daly City, California
Encl; (1) MARRIAGE CERTIFICATE
WE ARE SORRY TO INFORM YOU OF THE DEATH OF YOUR HUSBAND PFC ROBERT D. LONON. HIS DEMISE WAS THE RESULT OF AN AUTOMOBILE ACCIDENT ON OR ABOUT 1100 TUESDAY, 2 FEBRUARY 1954, IN SAN LUIS OBISPO. WE DID NOT KNOW OF HIS MARITAL STATUS UNTIL ABOVE ENCLOSURE ALONG WITH YOUR ADDRESS WAS FOUND AMONG HIS EFFECTS, THEREFORE THE GOVERNMENT CAN. MAKE NO RETRIBUTIONS.

/s/ D. S. RAMSEY Jr.
D. S. RAMSEY Jr
(Major, USMC)
Legal Officer."

It is almost superfluous to note that D. S. Ramsey, the purported author of the letter, is not a Marine Corps officer. The name is that of another girl friend of the accused. The letter with the accused's marriage certificate was enclosed in an official "franked" envelope and mailed.

Patricia's mother received the letter on February 4. She brought it to Patricia, who read it and "broke down completely." Patricia believed that her husband was dead. She and her mother immediately tried to ascertain what had happened. They communicated with the Marine Barracks at Moffett Field. No one in authority knew a Private Robert D. Lonon, either "dead or alive." However, a few days later a bag containing some personal effects identified as belonging to the accused was turned over to the commanding officer of the Marine Barracks. Inside a cap found in the bag was a carbon copy of the letter sent to Patricia.

In due course, the accused was charged with forgery of the letter in violation of Article 123, Uniform Code of Military Justice, 50 USC § 717 (Charge I and its specification). Later, two specifications, alleging conduct in violation of Article 134, were added. Specification 1 alleged that the accused violated 18 USC § 1341 by devising a scheme to defraud Patricia of her "marital benefits" and mailing the false letter for the purpose of executing the scheme. Specification 2 alleged that without proper authority he caused the letter to be typed on an official letter form and mailed as an official and authentic communication. At the trial the accused explained his conduct as follows:

"Well, I didn't want to hurt Pat in any way and I was to be transferred the next day. I wasn't absolutely sure that she loved me. I knew that she had another interest, a soldier, and I thought that possibly if she thought that I was dead it would be better than hurting her, and in that way she could go ahead and marry the soldier. I thought possibly she would drop the issue thinking that I was dead."

Before the accused's arraignment, defense counsel made several motions. Among these were a motion to dismiss the forgery charge on the ground that the letter had no apparent legal efficacy and a motion to dismiss, as multiplicious, the specifications of the Additional Charge. The law officer denied the former and reserved decision on the latter. The court duly returned findings of guilty on all charges. Before it closed to deliberate on the sentence, the law officer ruled on the defense motion regarding multiplicity. He was of the opinion that specification 2 of the Additional Charge was a lesser included offense to specification 1, and he ordered it dismissed. He instructed the court that the dismissed specification should not be considered in fixing a sentence. In an open court colloquy with defense counsel he also said:

"If the law officer felt that the court would be required to make an election, he would sustain the motion. It is felt that the court need not make an election—that there are separate offenses alleged but that the court is well aware that both offenses, as alleged, were based upon essentially the same act. The court should do justice in the case without intervention of the law officer in that respect. It is a matter of degree rather than legal technicality. It is a matter of degree of punishment involved. In other words, I would think that this court would not impose the maximum sentence upon two offenses based upon the same transaction."

On opening the court for announcement of the sentence, the president of the court said:

"The court has come to its sentence, but before announcing it the court wishes to state that in arriving at a sentence the court considered that the merger of the two offenses of which the accused has been convicted has originated from a single act."

The sentence adjudged by the court included a dishonorable discharge and confinement at hard labor for one year. The convening authority mitigated the dishonorable discharge to a bad-conduct discharge and suspended its execu-

tion. He also reduced the period of confinement to nine months. As modified, he approved the sentence. A divided board of review also affirmed. The Judge Advocate General of the Navy then filed a certificate requesting review of certain questions. Additionally, this Court granted the accused's petition for review, his claim being that the charges are multiplicious.

The first question presented by the certificate for review is as follows:

"(1) Does the specification of the original Charge which, in the form prescribed in paragraph 93 appendix 6c, MCM, 1951, sets forth that the accused did cause to be issued a Naval Speedletter which informed the accused's wife of his death, and which was signed with a false signature, allege the offense of forgery?"

Merely completing the blanks in a particular form of specification set out in the Manual for Courts-Martial, United States, 1951, does not guarantee a legally unassailable charge. The specification must set out every essential element of the offense, either directly or by necessary implication. United States v Fout, 3 USCMA 565, 13 CMR 121.

Forgery has been variously defined by the courts and by legal writers. A common definition describes forgery as "the false making or materially altering, with intent to defraud, of any writing, which, if genuine, might apparently be of legal efficacy or the foundation of a legal liability." Wright v United States, 172 F2d 310, 311 (CA 9th Cir) (1949). That definition of the offense is accepted in military law. Article 123, Uniform Code of Military Justice, 50 USC § 717; Manual for Courts-Martial, supra, paragraph 202, page 362. The elements of the crime are delineated in Article 123 of the Uniform Code as follows:

"ART. 123. *Forgery.*

"Any person subject to this code who, with intent to defraud—

(1) falsely makes or alters any signature to, or any part of, any

**301**

writing which would, if genuine, apparently impose a legal liability on another or change his legal right, or liability to his prejudice; or

(2) utters, offers, issues, or transfers such a writing, known by him to be so made or altered; is guilty of forgery and shall be punished as a court-martial may direct."

The Government and the accused agree that the critical question in this case is whether the letter has apparent legal efficacy. That question is not concerned with the falsity of the contents of the letter, but only with what it purports to be. A writing may be made with knowledge that the in- formation it contains is false, but if it is genuine it is not a forgery. United States v Staats, 8 How 41 (1850) ; United States v Davis, 231 US 183, 58 L ed 177, 34 S Ct 113. With this distinction clearly in mind, we turn to the apparent legal efficacy of the letter.

The Government contends first that since the letter states that Private Lonon is dead, it provides "the basis of a claim for survivor's benefits." The obvious answer to this contention is the language of the letter. It plainly disclaims all responsibility on the part of the Government for "retributions" which might otherwise be due to a surviving spouse. Moreover, the letter could not be used in any proceeding against the Government to establish either Patricia's status as a surviving spouse, or the fact of Private Lonon's death. No law or regulation has been called to our attention, and we know of none, which would make the letter legal proof of death or of the existence of a marital status. On the contrary, pertinent service regulations indicate that the kind of letter used here is intended only to convey information and not to constitute legal proof of the contents. Marine Corps Manual, paragraph 13050, et seq.; Bureau of Naval Personnel Manual, articles C–9802, C–9805. Thus, claims by a spouse for survivor benefits must be substantiated by a "certified copy of the public or church record of marriage." Id, article B–2109. In the case of death of personnel on active duty, a certificate of death may be issued by the Bureau of Medicine and Surgery. Id, article C–9807 (5) (b). Additionally, no claim for insurance benefits could be predicated upon the letter. Veterans Administration regulations require that the death of a person "in the active service" be proved by "an official report of death from the Department of the Army or Navy" or by "the public record of the State or community where death occurred." 38 CFR § 3.55 (a), (c) (1949 ed).

On its face, therefore, if genuine, the letter could not possibly prejudice the Government in any legal way. It conferred no rights against the Government, upon Patricia, or upon anyone else which would not have existed if the letter had not been written. See Territory v DeLena, 3 Okla 573, 41 Pac 618; United States v Swan, 13 Fed 140 (Ed Mo) (1904).

As an alternative argument on the apparent legal efficacy of the letter, the Government maintains that, if genuine, the letter deprives the accused's wife of "financial support as well as the benefits of marital relationship to her prejudice." This contention fails to distinguish between the falsity of the contents of the letter and the falsity of its execution. Unquestionably, the letter was written to make Patricia believe that the accused was dead. For a while, it succeeded. But intended or completed fraud does not constitute forgery. The written instrument used to accomplish the deception must have apparent efficacy to create, increase, diminish, discharge, transfer, or otherwise affect a legal right. Thus, a false letter of introduction may induce a person to extend courtesies which he would not have accorded in the absence of the letter; but having no apparent legal force, the letter, without more, cannot be the basis for a charge of forgery. Waterman v People, 67 Ill 91; State v Evans, 15 Mont 539, 39 Pac 850. For the same reason the false signing of the name of a candidate for public office to a letter reciting his proposed legislative program is not a forgery.

302

Barnes v Crawford, 115 NC 76, 20 SE 386. Other examples are readily available, but we need not catalogue them. The important thing is to note the difference between the contents and the legal effect of the instrument. Putting aside then the falsity of the information contained in the letter, what possible legal consequences could it have as to Patricia?

The Government argues that it deprived her of her right to support and other marital benefits. We fail to see how it could have that effect. To be the subject of a forgery, █ the letter must be capable of being used as proof of the facts it recites. State v Smith, 16 Tenn 150 (8 Yerg); State v Corley, 63 Tenn 410. In other words, the instrument must be invested with some legal force. If that is lacking, the making of the writing, even though false, is not forgery. It has been held, for example, that it is not forgery to make a false instrument which purports to be a decree of divorce but which on its face indicates that it is not an official record. Brown v People, 86 Ill 239, 29 Am Rep 25. In State v Anderson, 30 La Ann 557, a consolidated return of votes in an election was held not to be the subject of a forgery because the return could not be used as evidence of the vote. On the other hand, it was held that the false making of a marriage certificate was forgery because the certificate could be used as evidence to establish rights arising from the marriage. State v Boasso, 38 La Ann 202.

Forgery may injure a person in his personal as well as in his property rights. State v Webster, 88 SC 56, 70 SE 422. Patricia's marital status, however, could not be affected legally in the slightest degree by the existence of the false letter. In no way could it be used to diminish, alter, or modify any of her marital rights. The Government's suggestion that it might operate to deprive Patricia of her spousal survivor benefits from the Government is untenable. True, the letter denies obligation on the part of the Government, but it has no legal effect. On its face, it is a mere expression of opinion, without any legal consequences. State

v Givens, 5 Ala 747. Hence, in the absence of allegation of extrinsic facts indicating how the letter could have some legal effect, it is a false but not a forged writing. State v Talip, 90 W Va 632, 111 SE 601.

It is also said by the Government that the letter has apparent legal efficacy to deprive Patricia of her right to support from the accused. If it has that effect, the offense of forgery is properly charged. But we find no merit in the argument. Again putting aside the false information contained in the letter, what legal value does it have? Certainly, it could not be used to bar or diminish any right of Patricia against her husband. In fact, nothing in the letter denies or limits Patricia's status as the accused's spouse, or her rights as such against him.

One aspect of the problem, which was not raised by the Government, requires consideration. An honest belief by one spouse that the other spouse is dead has certain legal implications. For example, in some jurisdictions the "surviving" spouse may remarry, after the lapse of a specified time; the second marriage would not subject the survivor to a prosecution for bigamy, even though the first spouse was still alive. 7 Am Jur, Bigamy, § 24, page 763. The question arises, therefore, whether the letter here can be regarded as a step in a series of acts which might perfect a legal right or liability. Commonwealth v Costello, 120 Mass 358. If it can be so considered, the offense is forgery, notwithstanding that the other steps have not been taken. Hall v State, 31 Ala App 455, 18 So2d 572; Commonwealth v Hilton, 35 Kan 338, 11 Pac 164. Here again, however, we must distinguish between the apparent legal effect and the falsity of the contents of the letter. As to the former, the letter is valueless. Patricia did not acquire any right which she did not have before the letter came into existence. As previously noted, the letter is not evidence of death. It furnishes information, but it has no legal significance. It is not alleged that because of the letter Patricia honestly believed that the accused was dead and that she was legally free to remarry. Even an allegation of such

**303**

extrinsic facts may not be sufficient to give the letter apparent legal efficacy, but in its absence the writing clearly has no legal consequence with regard to Patricia. Undeniably, the fabrication of the letter was reprehensible, and the accused's conduct toward his wife was base and despicable; but it was not an instrument of apparent legal efficacy. We conclude, therefore, that the offense set out in the specification of the original charge is not forgery. Consequently, the first certified question is answered in the negative.

The second certified question relates to Patricia's status as a witness against the accused. Patricia was subpoenaed as a witness for the prosecution. She testified that the court-martial proceeding was "against . . . [her] objections," and that she was told that "if . . . [she] didn't come . . . [she] would get thrown in jail." At the trial, the accused claimed the spousal privilege but it was denied by the law officer. The question certified is as follows:

"(2) Was the wife of the accused 'the individual . . . injured by the offense' within the meaning of that phrase as it is used in paragraph 148e, MCM, 1951, so as to deprive the accused of his privilege to prohibit her use as a witness against him in this case."

The general rule is that a husband or wife is entitled to a privilege prohibiting the use of the other as an adverse witness. Griffin v United States, 336 US 704, 93 L ed 993, 69 S Ct 814; Manual for Courts-Martial, United States, 1951, paragraph 148e. The privilege is different from the privilege which protects confidential communications between a husband and wife. Although it has been vigorously attacked as illogical, it still exists. Wigmore, Evidence, 3d ed, § 2228. On proper objection, the accused's wife cannot be compelled to testify against him. United States v Richardson, 1 USCMA 558, 567–568, 4 CMR 150. The general rule, however, does not extend to cases in which the spouse presented as an adverse witness is "injured by the offense with which the other spouse is charged." Manual,

supra, paragraph 148e. The narrow question, therefore, is whether Patricia was injured by either of the offenses of which the accused was convicted.

Paragraph 148e of the Manual sets out a number of situations in which a testifying spouse is injured by an offense committed by an accused.

"Husband and wife are competent witnesses in favor of each other. Although husband and wife are also competent witnesses against each other, the general rule is that both are entitled to a privilege prohibiting the use of one of them as a witness (sworn or unsworn) against the other. This privilege does not exist, however, when the husband or wife is the individual or one of the individuals injured by the offense with which the other spouse is charged, as in a prosecution for an assault upon one spouse by the other, for bigamy, polygamy, unlawful cohabitation, abandonment of wife or children or failure to support them, for using or transporting the wife for 'white slave' or other immoral purposes, or for forgery by one spouse of the signature of the other to a writing when the writing would, if genuine, apparently operate to the prejudice of such other."

Plainly the enumeration is illustrative, not exclusive. It is also clear that injury to a testifying spouse is not confined to physical wrong but includes injury to personal rights. See: United States v Ryno, 130 F Supp 685 (SD Calif). The Manual does not define the full scope of the exception, and neither need we mark out its metes and bounds.

Abandonment is a spousal injury which falls within the exception to the general rule. Specification 1 of the Additional Charge alleges use of the mails by the accused in connection with a scheme to defraud his spouse of her "marital benefits." The substance of the scheme was to induce the accused's wife to believe him dead. These allegations seem to us to be sufficient to establish an abandonment, and thereby bring the case within the exception. Of course, the actual offense with which

304

the accused is charged is misuse of the mails. However, the individual rights of the wife are nevertheless affected. In Kerr v United States, 11 F2d 227 (CA 9th Cir) (1926), the defendant was also charged with improper use of the mails. He sent his wife a box of chocolate candy. Before mailing the candy, he impregnated it with sodium cyanide, a poison. At the trial, the defendant's wife was called by the Government to testify against him. Over the accused's objection, the trial judge allowed the wife to testify. Unanimously sustaining the ruling, the Court of Appeals for the Ninth Circuit said (page 228):

". . . By the common law a wife had a right to testify against her husband in a case of personal violence by the husband against her, and in our opinion the mailing of poisoned candy by a husband to his wife with intent to kill her constituted such attempted personal violence against her as to make her a competent witness against him in respect to the act charged." [Kerr v United States, supra.]

In reaching the conclusion that Patricia's testimony is admissible we have not overlooked her statement that she "objected" to the court-martial proceeding. Ordinarily the "injured" spouse is a willing witness against the offending spouse. But, if the witness spouse does not want to testify, may the testimony nonetheless be compelled?

After noting that in some jurisdictions the privilege is accorded only to the witness, the Court of Appeals for the Second Circuit said:

". . . clearly the better view is that the privilege is that of either spouse who chooses to claim it." [United States v Mitchell, 137 F2d 1006, 1008 (1943).]

In the District of Columbia the rule is that "husband and wife shall be competent but not compellable to testify for or against each other." Title 14, District of Columbia Code (1951 ed), § 14–306. Wigmore observes that "Rarely is the privilege denied to belong to the witness-spouse." Wigmore, Evidence, 3d ed, § 2241. He cites King v

Lapworth, 1 KB 117 (1931), as one of the rare cases in which the privilege has been denied to the witness spouse. The Lapworth case, however, is referred to in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, as authority for the view that under paragraph 148e of the Manual, a witness spouse who is injured by the offense "may be required to testify." Ibid, page 235. See also, 58 Am Jur, Witnesses, § 191, page 134. We need not decide the question of compellability. Patricia's mother, other witnesses, and the accused himself testified to every material fact contained in Patricia's testimony. Consequently, aside from Patricia's failure to claim the privilege as such, the admission of her testimony did not prejudice the accused. See: United States v Nichols, 2 USCMA 27, 34, 6 CMR 27.

The third certified issue presents a question of trial procedure. As framed by the certificate, the question is as follows:

"(3) What is the effect upon the findings in this case of the action of the law officer in dismissing the second specification of the Additional Charge after the court-martial had returned a finding of guilty thereto?"

The Government concedes that specification 2 of the Additional Charge was in fact dismissed. It contends that the dismissal resulted from the action of the reviewing authority rather than from the ruling by the law officer at the trial. This concession would make academic further discussion of the effect of the law officer's ruling. However, the Government's reasons for the concession raise problems of their own. Consequently we prefer to consider the question on the merits instead of uncritically accepting the Government's concession.

Both the Government and the accused agree on the general powers of the law officer. Thus, they are in accord on his authority to rule finally on all interlocutory matters, except two which are not applicable here. Article 51(b), Uniform Code of Military Justice, 50 USC § 626; United States v Knudson, 4 USCMA 587, 16 CMR 161; United

**305**

States v Dykes, 5 USCMA 735, 19 CMR 31. They also agree that a motion to dismiss a specification on the ground of multiplicity usually presents a question of law which is interlocutory in nature. United States v McCormick, 3 USCMA 361, 12 CMR 117. Finally, they both agree that the law officer may change a particular ruling made by him "at any time during the trial." Article 51(*b*). At this point, the Government and the accused part company. The Government maintains that for the purpose of Article 51(*b*) a trial ends with the findings of guilty, while the accused argues that the trial includes the sentence procedure.

Although novel, the Government's construction of the phrase "during the trial" is unsupportable. ▪ We doubt that any one ever before imagined that a court-martial trial ends with the findings, unless, of course, they are findings of not guilty. It seems to us that the Uniform Code clearly intends to include the sentence procedure as part of the trial. During that phase of the proceedings, the law officer continues to function in his regular capacity as the final arbiter on matters of law. For example, the law officer is required to determine the admissibility of evidence of previous convictions. United States v Jones, 1 USCMA 302, 3 CMR 36. He considers the "apparent authenticity" of affidavits and certificates of military officers and decides whether he should relax the ordinary rules of evidence and admit them in extenuation and mitigation. Manual, supra, paragraph 75*c*(1), page 120. Moreover, he instructs the court on the maximum punishment that may be adjudged, especially when the Table of Maximum Punishments does not provide a specific punishment for the offense charged. See United States v Blevens, 5 USCMA 480, 18 CMR 104.

Until the sentence proceedings are complete, the trial is not ended. Until the trial ends, the law officer acts as the final authority on interlocutory matters. Therefore, it follows that he has the power to change any ruling on an interlocutory matter in the sentence stage of the proceedings to the same extent that he can before the court retires to deliberate on the findings of guilt. The exercise of the power rests in his discretion.

Here, the law officer did not actually change a ruling. Instead, he initially reserved decision and then ▪ ruled at a later stage of the trial. The power to change a ruling clearly includes the power to reserve decision. If the law officer has any doubt about a question requiring a ruling, good sense and sound practice require careful consideration of the question, rather than an "off the cuff" decision. Civilian courts recognize the practice of reserving decision on a motion raising a question of law, until after the verdict of the jury. Italian Star Line v United States Shipping Board E. F. Corp., 53 F2d 359 (CA2d Cir) (1931). There is no compelling reason requiring a different practice in the military, particularly when the procedure is consistent with the logical construction of Article 51 (*b*).

The occasions when a law officer will be called upon to change a ruling or reserve decision until after the findings are few in number. However, the law officer is the best judge of what action he should take. In our opinion, the law officer in this case acted wisely. The Manual cautions against using one transaction as a basis for an unreasonable multiplication of charges. Paragraph 126*b*; United States v Keith, 1 USCMA 442, 4 CMR 34. If the accused believes that the charges are multiplicious, he should move to dismiss one or more of them. Manual, supra, paragraph 67*b*, page 96. The law officer may grant the motion, deny it, or, as he did here, reserve decision on it until the facts are developed and he is better able to evaluate their legal effect. However, whenever he rules, his decision becomes the law of the case. Unless set aside on appeal, his ruling is binding on the Government as well as on the accused. United States v Knudson, supra; United States v Smith, 4 USCMA 369, 15 CMR 369. Hence, notwithstanding the court's findings of guilty, specification 2 of the Additional

Charge was effectively dismissed as a result of the law officer's ruling.

Left for consideration is the question of multiplicity and the effect of our conclusion that the offense set forth in the specification of the original charge is not forgery. A misnomer of the offense does not invalidate a proper charge. What then is the charge here? Are the allegations sufficient to set out an act of misconduct punishable under the general Article of the Uniform Code, or has Congress so preempted the field of false instruments in other Articles of the Code as to preclude a charge under Article 134, 50 USC § 728? See United States v Norris, 2 USCMA 236, 8 CMR 36. In view of the peculiarities of this case we need not decide the question. If an offense is stated, a substantial issue of multiplicity is presented by reason of the law officer's ruling dismissing specification 2 of the Additional Charge. If an offense is not stated, the specification, of course, cannot be used as a basis for punishment. In either event, the important consideration is the effect of the specification on the sentence.

At the trial level, the specification was believed to state the offense of forgery. A finding of guilty was returned on that specification and also on the one alleging use of the mails to defraud. Forgery and using the mails to defraud, in violation of 18 USC § 1341, are both punishable by confinement for five years. Manual, supra, paragraph 127c, section A, page 223. Apparently, as a result of the extended discussions between the law officer and defense counsel on the question of multiplicity, the court prefaced its announcement of the sentence with an explanation of the basis upon which it was reached. It appears from that explanation that the court did not impose punishment for the two offenses on which it had returned findings of guilty. Rather, it merged them and imposed punishment for a "single act" for which five years was the maximum punishment. It is plain therefore, that the accused was not harmed by the findings of guilty with regard to the original charge. United States v Best, 6 USCMA 39, 19 CMR 165; United States v Nelson, 3 USCMA 482, 13 CMR 38. However, to avoid any possibility that the mistaken description of the original charge as forgery had any influence whatsoever, we deem it appropriate to order reconsideration of the sentence in the light of our opinion.

The certified questions and the one on which we granted review are answered as indicated. The findings of guilty of the specification of the Additional Charge are affirmed. The record of trial is returned to The Judge Advocate General of the Navy for submission to a board of review for redetermination of an appropriate sentence.

Judge LATIMER concurs.

BROSMAN, Judge (concurring):

I am in close enough agreement with the author of the principal opinion to be able to concur outright.

## II

Guilt of the crime of forgery must be predicated on a false signature or writing "which would, if genuine, apparently impose a legal liability on another or change his legal right or liability to his prejudice." Uniform Code, Article 123, 50 USC § 717. In describing this offense, the Manual for Courts-Martial, United States, 1951, observes that, "As regards the apparent legal efficacy of the writing falsely made or altered, the writing must on its face appear to impose a legal liability on another, for example, a check or note, or to change a legal right or liability to the prejudice of another, as a receipt. The false making, with intent to defraud, of an instrument affirmatively invalid on its face is not forgery because it has no legal efficacy. . . . It is not forgery to make falsely or alter with intent to defraud a writing which does not operate to impose liability on another or change a legal right or liability to his prejudice, as, for example, would ordinarily be the case where a mere letter of introduction was involved." Paragraph 202. In civilian courts, like courts-martial, it seems well-settled that, "A writing or instrument in order to constitute a forgery must possess

some apparent legal efficacy." 23 Am Jur, Forgery, § 28; 37 CJS, Forgery, § 14.

To the prejudice of whom would the Navy "speed letter" before us here have operated had it been genuine? Against whom could it possibly have created liability? The fictitious Major Ramsey, had he been *in esse,* would have been placed under no obligation by it—regardless of the truthfulness or falsity of its recitals. The communication did not purport to create rights of any nature against the United States; indeed its tenor was directly to the contrary. Therefore, if genuine, it would not have operated to the prejudice of the Government. Nor did it, of its own terms, purport to possess legal efficacy in terminating rights enjoyed by the recipient, "Mrs. Robert D. Lonon." It was simply meant to serve as notice of a death, and, although genuine, would have lacked the power to sever any right of hers to receive benefits—either death benefits or allotments payable to the spouse of a living military person. In short, and to my mind, the "speed letter" corresponds closely to the Manual's example of "a mere letter of introduction"—and, within the intendment of both that source and an impressive array of civilian precedents, its making and utterance did not constitute forgery.

Like the Chief Judge, I am inclined to believe that this deficiency in the Government's case is evident from the very language of the specification—purportedly laid under Article 123—and that, therefore, it is on its face insufficient to allege forgery. Be that as it may, however, it is unmistakable that the evidence fails to support a finding of guilt of this offense.

III

Regardless of whether the original charge was insufficient to allege an offense, or whether, although sufficient, the offense stated therein served to duplicate that set out in the additional charge, I must reach the conclusion that the maximum penalty imposable runs to no more than five years' confinement. As the Chief Judge has pointed out, the court-martial appears to have given consideration to the circumstance that all offenses alleged stemmed from a single act. Thus, in all likelihood its members approached the problem of sentencing exactly as they would have done had they been informed that five years' confinement constituted the maximum punishment lying within their power—this being the limit for both forgery and a violation of 18 USC § 1341. At the same time, like Judge Quinn, I would dispel all doubt by returning the case to a board of review for reconsideration of sentence.