UNITED STATES, Appellee

v

JOHN A. PHILLIPS, First Sergeant, U. S. Army, Appellant

14 USCMA 620, 34 CMR 400

*Captain Daniel H. Benson* argued the cause for Appellant, Accused. With him on the brief was *M. Daniel Maloney, Esquire,* and *Colonel Joseph L. Chalk.*

*Captain Joel Robinson* argued the cause for Appellee, United States. With him on the brief were *Colonel Bruce C. Babbitt, Lieutenant Colonel Francis M. Cooper,* and *Captain Thomas E. Towe.*

## Opinion of the Court

FERGUSON, Judge:

A general court-martial convened at Ford Hood, Texas, convicted the accused of four specifications of forgery, in violation of Uniform Code of Military Justice, Article 123, 10 USC § 923, but acquitted him of related counts of larceny, in violation of Code, supra, Article 121, 10 USC § 921, and using the mails to defraud, in violation of Code, supra, Article 134, 10 USC § 934. He was sentenced to bad-conduct discharge. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon the assertion:

"There is insufficient evidence in the record of trial to sustain a conviction."

In light of the nature of the assignment, we turn to the record and recount the state of the proof as found therein, for resolution of the question depends solely upon that which is before us.

In separate specifications, the accused is charged with falsely making the signatures of Specialist Fourth Class Paul W. Beck and Specialist Fourth Class Elmer Grohmann to Department of the Army Allotment Authorization Forms, purporting to authorize the deduction from each individual's pay of a monthly sum and its forwarding to Continental Life Insurance Company, Fort Worth, Texas, in satisfaction of premiums due on insurance contracts into which the named allottees had allegedly entered. The accused was further charged with uttering these Allotment Authorization Forms, knowing them to have been falsely signed.

From the evidence, it appears that the accused, stationed at an Army missile site in Louisiana, as battery first sergeant, was approached by certain civilian insurance agents and agreed to solicit insurance and provide them with leads to prospective customers on his base. Subsequently, when business became poor, these agents returned and suggested two plans whereby it might be increased. One of these was denominated as "fence-posting" and consisted of having individuals fill out applications for insurance to be written by Continental, pay the first premium, and then allow the policy to lapse. The other, known as "bones," required filling in completely false applications for insurance in the name of an individual, without his knowledge or consent, attaching thereto an equally false carbon copy of an authorization for institution of an allotment to pay the premiums, and forwarding the completed application and carbon of the allotment form to Continental. The advantage of ei-

ther of these fraudulent schemes lay in Continental's arrangement with the agents to pay to them a drawing account equal to approximately four times the first month's premium on all business written.

The record indicates that the accused agreed, in return for specific payments, to prepare "bones," and the evidence is sufficient to establish that he falsely made out applications to Continental for the issuance of life insurance policies in the names of Paul W. Beck and Elmer Grohmann and that he also placed the signatures of these men on original Allotment Authorization Forms, copies of which were attached to the applications and turned over to the insurance agents. The agents, in turn, forwarded the applications and attached carbon allotment forms to Continental, who credited them with an earned commission and utilized such a basis for advance payment.

Accomplishment of the Allotment Authorization Forms was carried out by signing the original, with an accompanying, rather faint carbon transfer of the signature to the copies forwarded to the insurance company. The originals were immediately destroyed, and only the carbon copy in each instance was used, for the entire scheme was directed toward defrauding the insurance company. These carbon copies on their face expressly state, "SIGN ORIGINAL ONLY." The basic question presented is whether, under the circumstances depicted in this record, such carbon copies of Allotment Authorization Forms are writings subject to being forged, *i. e.*, having apparent legal efficacy.

Allotments consist of the allocation of a portion of a service member's pay to a prescribed allottee, under such regulations as may be prescribed, for such purposes as the Secretary of the Army may think fit. See 10 USC § 3689 and, generally, Army Regulations 37–104, Chapter 11. One of the purposes for which the Secretary has authorized allotment of pay is the satisfaction of commercial life insurance premiums. AR 37–104, supra, paragraph 11–32c. Department of the

**622**

Army Form 1341, entitled "Allotment Authorization (To Start, Stop, and Change allotments)," is utilized to authorize disbursing officers to deduct the amount allotted from the individual's pay and forward it to the designated insurance company. The original is signed and transmitted by the allotter's personnel officer to the appropriate finance and accounting officer. A duplicate copy is filed as a semipermanent document in the allotter's records' folder, and a carbon copy is furnished the individual concerned for his own records and information. No copy is prepared for transmittal to the insurance company concerned, and the use of forms printed or overprinted by private agencies is prohibited. See generally, AR 37–104, paragraphs 18–81, *et seq.* Indeed, the furnishing of such forms to insurance companies in particular is forbidden. Army Regulations 600–101, paragraphs 6e, 10. Only the signed, original copy of the authorization form may be used by the finance officer to institute or terminate the allotment with which it deals.

The documents before us, to which it is claimed the accused falsely made the signatures of Beck and Grohmann and which he allegedly uttered, are the carbon copies normally furnished the allotter for his information and, in this case, furnished to the insurance company at its request as a part of the applications involved in order to evidence the *bona fides* of the transactions. The Government, however, contends before us that it was the originals of these Allotment Authorization Forms which it is alleged accused forged, and any considerations involved in the use of carbon copies as the *res* of the forgery are simply not material here. On the state of *this* record, we are required to disagree. Undoubtedly, an original Allotment Authorization ■■■■■■ ■ Form might be the subject of a violation of Code, supra, Article 123, for it seemingly would have efficacy to deprive the purported allotter of a portion of his pay and allowances to which he would otherwise be entitled. See United States v Addye, 7 USCMA 643, 23 CMR 107; State v Baumon, 52 Iowa 68, 2 NW 956 (1879),

and Dixon v State, 26 SW 500 (Tex) (1889). That, however, is not the theory on which this case proceeded below, and the state of the evidence demonstrates not only that the originals of the forms were destroyed after their preparation but also that only the carbon copies were used or intended to be used. The scheme was, as noted above, to obtain payment of commissions from Continental upon the pretense of having accomplished the writing of policies represented by the application forms and carbons of allotment authorizations submitted to it. Indeed, the Government's contention founders immediately upon the inescapable fact that accused was not only charged with making signatures to the forms but also with their utterance. The trial counsel's argument aptly demonstrates the manner in which the case was put to the fact finders:

". . . There is an inference, gentlemen, there is a strong inference that he signed the name of Paul W. Beck on that allotment form. Mr. Lundelius said they were usually received together, the allotment form and the application. *It is true that the writing is faint on the document. It had to be that way, gentlemen, because they were copies. If the man had written with a pen on that allotment form that went to the company it obviously would be a forgery. The signature had to be a little bit light. It was supposed to be a copy of the original. I am sure you will consider this when you deliberate as to the question of guilt as to Specification 1 [the making] in violation of Article 123.*

"The same holds true in the case of Elmer Grohmann [the other alleged making]." [Emphasis supplied.]

In addition, the law officer expressly required the court-martial to find the accused falsely made the signatures of Beck and Grohmann to the writings in question, which, under the circumstances, could likewise only refer to the copies. These considerations indicate that, here, as below, the original forms should play no part in the proceedings.

Having based all its contentions at the trial upon the use of the carbons, it is not free now to change its position on appeal and assert that, to prove accused's guilt, it relies only upon the preparation of the original forms which were, in every instance, destroyed and which played no part below. Cf. United States v Rowe, 13 USCMA 302, 32 CMR 302.

Not every false writing constitutes the offense of forgery. In United States v Strand, 6 USCMA 297, 20 CMR 13, this Court held that a falsely prepared and signed letter, purporting to inform the accused's wife of the death of her husband, did not constitute an instrument which could be the subject of a violation of Code, supra, Article 123. There, we said, at page 302:

"The Government and the accused agree that the critical question in this case is whether the letter has apparent legal efficacy. That question is not concerned with the falsity of the contents of the letter, but only with what it purports to be. A writing may be made with knowledge that the information it contains is false, but if it is genuine it is not a forgery. United States v Staats, 8 How 41 (1850); United States v Davis, 231 US 183, 58 L ed 177, 34 S Ct 113. With this distinction clearly in mind, we turn to the apparent legal efficacy of the letter.

. . . . .

"On its face, therefore, if genuine, the letter could not possibly prejudice the Government in any legal way. It conferred no rights against the Government, upon Patricia [accused's wife], or upon anyone else which would not have existed if the letter had not been written. See Territory v DeLena, 3 Okla 573, 31 Pac 618; United States v Swan, 13 Fed 140 (ED Mo) (1904).

". . . [I]ntended or completed *fraud does not constitute forgery. The written instrument used to accomplish the deception must have apparent efficacy to create, increase, diminish, discharge, transfer, or*

**623**

*otherwise affect a legal right.* Thus, a false letter of introduction may induce a person to extend courtesies which he would not have accorded in the absence of the letter; but having no apparent legal force, the letter, without more, cannot be the basis for a charge of forgery. Waterman v People, 67 Ill 91; State v Evans, 15 Mont 539, 39 Pac 850. For the same reason the false signing of the name of a candidate for public office to a letter reciting his proposed legislative program is not a forgery. Barnes v Crawford, 115 NC 76, 20 SE 386. Other examples are readily available, but we need not catalogue them. *The important thing is to note the difference between the contents and the legal effect of the instrument.* Putting aside then the falsity of the information contained in the letter, what possible legal consequences could it have as to Patricia?

. . . . .

". . . On its face, it is a mere expression of opinion, without any legal consequences. State v Givens, 5 Ala 747. Hence, in the absence of allegation of extrinsic facts indicating how the letter could have some legal effect, it is a false but not a forged writing. State v Talip, 90 W Va 632, 111 SE 601." [Emphasis supplied.]

In United States v Farley, 11 USCMA 730, 29 CMR 546, we similarly refused to hold a life insurance application, falsely completed by the accused, to be the subject of forgery, at least without the allegation of extrinsic facts. There, the accused, as here, apparently engaged in the "bones" type transaction, submitting to the insurance company totally false applications for life insurance and receiving in each instance a commission from its agent. Reiterating the necessity for a writing to have apparent *legal* efficacy in order to be the subject of forgery, we declared, at page 732:

"Our attention has been called to two decisions on the subject. In Dudley v State, 10 Ala App 130, 64 So 534, the court sustained an indictment for forgery based upon an application for insurance in which the applicant's signature was falsely made by the defendant. However, in Commonwealth v Dunleay, 157 Mass 386, 32 NE 356, the court apparently reached an opposite result. It held that the application is not a contract; while it might be used in such a way as to prejudice the legal rights of another, the 'mere possibility' of such use was not sufficient to support the indictment. In our opinion, the *Dunleay* case more nearly describes the inchoate nature of the insurance application. Without allegation of extrinsic facts showing how the application could be, or was in fact, used to prejudice the legal rights of another, the specification is legally insufficient to charge an offense under Article 123. United States v Strand, supra; cf. United States v Addye, 7 USCMA 643, 23 CMR 107."

On the other hand, the Court has concluded that a falsely made and signed request for partial payment was an instrument "which 'perfects' the accused's legal right to partial payment in advance of the time he would ordinarily be entitled to pay" under then extant Army regulations, and was, accordingly, prepared in violation of our forgery statute. United States v Addye, supra. Similarly, it is clear that a check, ration book, or similar instrument may be the basis of a forgery conviction. United States v Bryson, 3 USCMA 329, 12 CMR 85; United States v Taylor, 9 USCMA 596, 26 CMR 376. In like manner, we have held receipts, payout slips, approved loan requests and money orders to be the subject of forgeries. United States v Noel, 11 USCMA 508, 29 CMR 324; United States v Davis, 12 USCMA 576, 31 CMR 162; United States v Jackson, 13 USCMA 66, 32 CMR 66; United States v Whitson, 14 USCMA 324, 34 CMR 104. In every instance, however, the inquiry has been directed toward the legal efficacy of the documents involved, and, as recently as United States v Whitson, supra, we noted again, at page 326:

"Not every writing containing false information or a false signa-

624

ture is a proper subject for a forgery charge. *It must appear the writing has apparent efficacy to create, discharge, transfer or otherwise affect a legal right or liability.* Article 123, Uniform Code of Military Justice, supra; United States v Strand, 6 USCMA 297, 20 CMR 13." [Emphasis supplied.] ·

Into which category do carbon copies of an allotment authorization fall? The answer, we believe, is largely to be found in United States v Strand, supra, and United States v Farley, supra. We are unable to perceive any legal efficacy which this informational copy might have had. It would not result in the issuance of a policy of insurance on either of the purported allotters. It conferred no legal right on the insurance company to collect premiums. The allotter named therein might, at his whim, have terminated the allotment immediately after forwarding such a copy to the company, and the company could not have demanded that the Government pay it the premium deductions on the basis of such copy. Moreover, it could not be accepted by a finance officer as authority to institute the allotment, for the regulations quite clearly require the *signed* original form to be used for such purpose. AR 37–104, supra. Nor did it, any more than the completed false application for insurance, add any legal basis for the agent to claim his commission or impose any legal obligation upon the company to pay it. To this extent, the situation is exactly as that involved in United States v Farley, supra, where the Court specifically refused to import apparent legal efficacy to insurance applications whose submission formed the condition precedent to Farley's receipt of payments from the agent. In short, the entitlement to commissions depended upon the valid sale of an insurance policy, and the existence of the false application, as in *Farley,* supra, or the false carbon copy of the Allotment Authorization Form, as in this case, was no more than evidence of such a transaction, as opposed to possessing legal efficacy in and of themselves. United States v Strand, supra.

Such is the sense of the holding in Commonwealth v Brewer, 113 Ky 217, 67 SW 994 (1902). There, the defendant was indicted for forging the signatures of certain school trustees to a document purporting to be a copy of an original contract, it being uncertain whether there was an original contract, of which the instrument purported to be a copy, or whether such original had been lost, destroyed, or was in the possession of the accused. In holding the indictment insufficient, the Court of Appeals remarked, at page 994:

". . . The indictment charges forgery of the signatures to the copy. It states also, that, if there was an original contract, the signatures to that were forged. Obviously the commonwealth could not maintain an indictment for the forgery of an instrument, the existence of which at any time is averred to be uncertain. So whatever of crime is charged in this indictment must consist in the false copying into the purported copy of signatures which were not appended to the original, if there was an original. This might be an ingredient in a cheat of one kind or another, but is not forgery, either at common law or under our statute. At common law 'the false writing must be such as, if true, would be of some real or seeming legal efficacy, since otherwise it has no tendency to defraud; in other words, it must either be in fact, or must appear to be, of legal validity, but it need not have both the appearance and the reality.' 2 Bish. New Cr. Law, § 533. Our statute . . . does not seem to materially change the common law. The copy not only has not the appearance of legal efficacy, but, if genuine, would have no actual legal efficacy. On its face, it is a copy. The indictment charges that it is a false copy. If genuine, it would not be evidence, nor is it evidence as it stands. It is as if the accused had told a lie in a letter,—very reprehensible, no doubt, but not forgery. . . . [T]he case here . . . is, in substance, nothing but a false statement in writing that there was a contract signed by certain named persons."

In the record before us, we have nothing more than the carbon copy of an original Allotment Authorization Form and which differs from the original in that no copy is to be signed, as evidenced both by the declaration on its face and the provisions of the Army Regulations governing the matter.[1] It is designed purely for internal use as a memorandum of the transaction to be retained by the allotter among his own records. As such, then, it is nothing more than a false statement in writing that an allotment had been placed in effect for the purpose of paying Continental monthly premiums on policies to be issued by it. United States v Strand, supra; Commonwealth v Brewer, supra. It has no legal efficacy, nor, in the absence of signatures or requirements therefor, could it be treated as a duplicate original, except, perhaps, for the purposes of the Best Evidence Rule. If genuine, the copy would not have the slightest legal effect on the rights of any of the parties involved in the fraudulent scheme herein depicted. It cannot, therefore, be the subject of a charge of forgery. Out of an abundance of caution, however, we reiterate that we deal here solely with a particular record involving carbon copies of the form and not with falsely made originals. Cf. United States v Addye, supra; People v Munroe, 100 Cal 664, 35 Pac 326, 24 LRA 33 (1893); Annotatation, 174 ALR 1300. Undoubtedly, there was here involved a scheme to obtain money from Continental under the false pretense that insurance had been written on the lives of Beck and Grohmann, and the copy of the vouchers purporting to have been executed by them served as evidence of that pretense. But the court-martial acquitted accused of that charge, and it is neither our right nor our function to extend the law of forgery beyond documents possessing apparent legal efficacy in order to see that he is punished on the basis of a crime he did not commit for something the court-martial found he did not do.

In sum, then, we hold, under the circumstances proved in this transcript, a carbon copy of an Allotment Authorization Form cannot be the subject of forgery in violation of Code, supra, Article 123. United States v Farley, supra; United States v Strand, supra; Commonwealth v Brewer, supra. We adhere to the positive requirement of the statute in question that documents have apparent legal efficacy to affect the rights of others in order for their false making to violate its terms. Such is not present here. Reversal, therefore, is required.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. The Charge and its specifications are ordered dismissed.

Chief Judge QUINN concurs.

Judge KILDAY concurs in the result.

---

[1] We pass the question, neither argued nor briefed, of according apparent legal efficacy to a false signature made to a document which, on its face, requires no signature to give it any effect. We note, however, that accused was charged with the false making of a signature, as opposed to the filling up of the form.