**UNITED STATES, Appellee,**

v.

**Benjamin K. THOMAS, Private First Class, U.S. Army, Appellant.**

No. 53,089.
SPCM 20510.

U.S. Court of Military Appeals.

Feb. 22, 1988.

For Appellant: *Captain Pamela G. Montgomery* (argued); *Colonel Brooks B. La Grua, Lieutenant Colonel Arthur L. Hunt, Major Stephen R. Dooley* (on brief).

For Appellee: *Captain Patrick D. O'Hare* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Gary F. Roberson, Captain Darrell R. Taylor* (on brief); *Colonel Norman G. Cooper.*

*Opinion of the Court*

EVERETT, Chief Judge:

A military judge sitting as a special court-martial convicted appellant, contrary to his pleas, of uttering a forged document, in violation of Article 123, Uniform Code of Military Justice, 10 U.S.C. § 923.[1] He was sentenced to a bad-conduct discharge and reduction to Private E–1. The convening authority approved the findings and sentence, and the Court of Military Review affirmed in a short-form opinion.

We granted review of this issue:

WHETHER THE DOCUMENT (COMMANDING OFFICER'S LETTER) WHICH WAS THE SUBJECT OF THE ADDITIONAL CHARGE (UTTERING A FORGED DOCUMENT) LACKED LEGAL EFFICACY AND THUS CANNOT BE THE SUBJECT OF A FORGERY AS A MATTER OF LAW.

Given the facts of this case as ascertained below, we conclude, as a matter of law,

---

1. Appellant also was charged with, but acquitted of, loansharking, in violation of Alabama law, and larceny.

that the writing was not the type capable of grounding a forgery charge or, by derivation, a charge of uttering a forged document.

I

On September 27, 1983, appellant applied to the Army Aviation Center Federal Credit Union, Fort Rucker, Alabama, for a loan in the amount of $5,000. The loan officers with whom appellant dealt provided him a credit reference form known as a "Commanding Officer's Letter" to be completed by his unit commander. According to these officials, appellant returned within 15–45 minutes with the completed form, ostensibly signed and completed by his commander. The form as tendered reflected that appellant had no disciplinary or financial problems and that he was an "[e]xcellent soldier." Their suspicions aroused by the swiftness of the response, the loan officers called appellant's unit and, of course, learned that no such document had been completed, signed, or even seen by the commander. Further examination confirmed that the signature and other entries had been falsely made.

The representations as to appellant's disciplinary and financial prospects were patently false for, as was well known both to appellant and his commander, appellant was actively being investigated for loansharking and larceny.[2] Indeed, some 3 days prior to this incident, the commander had reviewed court-martial charges for these offenses against appellant. The charges were formally preferred and read to appellant 2 days after the loan-application incident. Also, the commander would not have characterized appellant's service as excellent.

Appellant's perspective of the events was somewhat different. He acknowledged applying for the loan and receiving the form from the credit union officials. He testified that he took the form to the commander's office—hoping to persuade him to make "some sort of favorable or at least neutral recommendation" despite "all of these other things [that] were hanging over ... [appellant's] head." While awaiting the commander's arrival, appellant chanced to converse with another soldier—one who "was aware of all the investigations that had been going on" and who (as luck would have it) was "PCS'ing out of the Army." According to appellant's testimony, this other soldier told him

> there was no way that that would happen [that the commander would make a favorable or neutral recommendation] because he knew the commander. And he told me that if I left that with him, that he would take care of it and that I could come back and pick it up ... later.

Seduced by the logic, appellant left the form with the other soldier and returned about 2 hours later to pick it up, knowing full well that the entries and signature on the form would not be that of the commander. Appellant's "recollection" was that it had been "the next day" when he returned the completed form to the credit union. After it came to light that the entries on the form were bogus, appellant promptly withdrew the application from the credit union.

II

Article 123 defines forgery in these terms:

> Any person subject to this chapter who, with intent to defraud—
>
> (1) falsely makes or alters any signature to, or any part of, any writing which would, if genuine, *apparently impose a legal liability* on another *or change his legal right or liability* to his prejudice; or
>
> (2) utters, offers, issues, or transfers such a writing, known by him to be so made or altered;
>
> is guilty of forgery and shall be punished as a court-martial may direct.

(Emphasis added.)

■ Obviously, uttering a forged writing under Article 123(2), the theory under which appellant was convicted, incorpo-

2. *See* n.1, *supra*.

rates Article 123(1) to the extent that the document involved must be "such a writing," *i.e.*, one "which would, if genuine, apparently impose a legal liability on another or change his legal right or liability to his prejudice." For want of a better shorthand term, this latter requirement is often called "legal efficacy."

■ Paragraph 202, Manual for Courts-Martial, United States, 1969 (Revised edition), explains that,

> [w]ith respect to the apparent legal efficacy of the writing falsely made or altered, the writing must appear either on its face or from extrinsic facts to *impose a legal liability* on another, or to *change a legal right or liability to the prejudice of another*. ... Thus, the false making, with intent to defraud, of an instrument affirmatively invalid on its face is not forgery nor is the false making or altering, with intent to defraud, of a writing which could *not impose a legal liability*, as a mere letter of introduction.

(Emphasis added.) Thus, the Code and Manual stand for the proposition that the mere making of a false signature or other entry on a document is not, in itself, sufficient to constitute forgery; the apparent nature of the document is also critical.

At common law, forgery was originally a misdemeanor. 36 Am Jur 2d, *Forgery* § 2 (1968). Blackstone defined it broadly as "the fraudulent making or alteration of a writing to the prejudice of another man's right." 4 W. Blackstone, *Commentaries on The Laws of England* 248 (Wendell ed. 1859). He goes on to point out that "more severe punishment"—*e.g.*, cutting off the ears, slitting and searing the nostrils, and death—was authorized by statute in specific instances. These instances included forgeries of bonds, instruments affecting real property, discharges of debt, bank notes, bills of credit, certain writings under seal, powers to receive or transfer stock or annuities, stamps, marriage licenses, wills, bills of exchange, promissory notes, securities, and the like. *Id.* at 248–49.

The proliferation of these statutes moved Blackstone to observe:

> I believe, through the number of these general and special provisions, there is now hardly a case possible to be conceived wherein forgery that tends to defraud, whether in the name of a real or fictitious person, is not made a capital crime.

*Id.* at 249 (footnotes omitted). Perhaps not by happenstance, all these specific writings to which Blackstone adverted appear to be of the sort having apparent legal efficacy. *See generally* W. Clark and W. Marshall, *A Treatise on the Law of Crimes* §§ 12.31–12.37 (6th ed. 1958); 2 J. Bishop, *A Treatise on Criminal Law* §§ 523–24 (9th ed. 1923); 2 W. Russell, *A Treatise on Crimes and Misdemeanors* 318–19 (1845). Nowadays, every jurisdiction defines forgery by legislation. 4 *Wharton's Criminal Law* § 493 (1981).

Federal civilian law is of no direct assistance to our search because there is no federal common-law counterpart to Article 123. Rather, many specific forgery-like offenses are denounced in various sections of the United States Code, such as 18 U.S.C. §§ 471–512 (counterfeiting and forgery) and 18 U.S.C. §§ 1001–30 (fraud and false statements). These statutes typically lack the requirement found in the Uniform Code of Military Justice that the writing "apparently impose a legal liability on another or change his legal right or liability to his prejudice." Thus, in *United States v. Weger*, 709 F.2d 1151, 1153 (7th Cir.1983), where the accused allegedly submitted a forged deed and title opinion to a bank in order to secure a loan—instruments with evident legal efficacy—she was not charged with forgery *per se* but with "making false statements to secure a loan from a bank insured by the Federal Deposit Insurance Corporation in violation of 18 U.S.C. § 1014."

Returning to Article 123, we note that it is essentially a restatement of the description of forgery found in paragraph 180*i*, Manual for Courts-Martial, U.S. Army,

1949.[3] At that time, forgery was proscribed by the 93d Article of War, which provided simply that "[a]ny person subject to military law who commits ... forgery ... shall be punished as a court-martial may direct." App. 1, p. 297, 1949 Manual, *supra.* It was at paragraph 180*i* of that Manual that the elements of the crime were fleshed out in this manner:

> (*a*) That a certain writing was falsely made or altered as alleged; (*b*) *that the writing was of a nature which would, if genuine, apparently impose a legal liability on another, or change his legal liability to his prejudice;* (*c*) that it was the accused who so falsely made or altered such paper; and (*d*) facts and circumstances indicating the intent of the accused thereby to defraud or prejudice a right of another person.

(Emphasis added.) Forgery was also chargeable under the Articles for the Government of the Navy (14th A.G.N., para. 5, and 22d A.G.N.). The description of the offense in Section 102, Naval Courts and Boards, 1937 (1945 reprint), was quite similar to that of the Army Manual.[4]

If it was not already, Congress must have become fully aware of the legal-efficacy limitation when Major General Thomas H. Green, the Judge Advocate General of the Army, registered his disagreement with the proposed language of Article 123. He countered with the following, broader definition:

> Any person subject to this code who, with intent to defraud or injure another—
>
> > (1) falsely makes or alters *any writing of a public or private nature, which might operate to the prejudice of another;*
>
> > \* \* \* \* \* \*

is guilty of forgery and shall be punished as a court-martial may direct.

Conspicuously absent from his proposal was any requirement that the writing have legal efficacy. His reasoning was that [t]he definition of this crime as presently set forth in article 123 is much too narrow insofar as it states that the instrument "would, if genuine, apparently impose a legal liability on another or change his legal right or liability to his prejudice." *There is no reason for requiring that the instrument might operate to the legal, as distinguished from other, prejudice of another.* False instruments which tend to impair or impede a governmental function have been held to be subjects of forgery (*Head v. Hunter,* 141 F.2d 449, 451 [10th Cir. 1944]). The proposed definition is taken from section 22–1401 of the Code of the District of Columbia.

*Uniform Code of Military Justice: Hearings on S. 857 and H.R. 4080 Before a Subcomm. of the Senate Comm. on Armed Services,* 81st Cong., 1st Sess. 277 (1949)(emphasis added). For whatever reason, Congress declined to enact General Green's proposal and adopted the language as originally drafted.

Historically, we have interpreted this provision rather strictly. In *United States v. Strand,* 6 U.S.C.M.A. 297, 20 C.M.R. 13 (1955), the accused concocted and sent to his wife a spurious "NAVAL SPEED LETTER," falsely informing her that he had been killed in an automobile accident. The letter bore the fraudulent signature of a Marine officer. Because the letter was of a type "intended only to convey information and not to constitute legal proof of the contents," we concluded that it lacked the requisite legal efficacy. *Id.* at 302, 20 C.M.R. at 18. The letter could not have been used by the putative widow to obtain

---

**3.** Para. 180*i*, Manual for Courts-Martial, U.S. Air Forces, 1949, is identical to the Army counterpart.

**4.** Section 102 provided in part:
Forgery is the fraudulent making or alteration of a writing to the prejudice of another man's right. The making or alteration must be false, made with intent to defraud. The instrument, as made or altered, must be of apparent legal efficacy, and therefore the alteration must be material. The offense is essentially making an instrument appear what it is not.

unwarranted benefits (thus defrauding the Government), and it could not have been used to deprive her of her legitimate spousal entitlements (thereby defrauding her). Whatever else Strand may have been guilty of, we concluded it was not forgery under the Uniform Code. *Id.* at 304, 20 C.M.R. at 20. We commented that

> intended or completed fraud does not constitute forgery. The written instrument used to accomplish the deception must have apparent efficacy to create, increase, diminish, discharge, transfer, or otherwise affect a legal right.

*Id.* at 302, 20 C.M.R. at 18. *Cf. United States v. Farley*, 11 U.S.C.M.A. 730, 732, 29 C.M.R. 546, 548 (1960) (fraudulent *application* for life insurance was "inchoate" in nature; "the 'mere possibility' of" use to prejudice of other insufficient for forgery charge); *United States v. Phillips*, 14 U.S. C.M.A. 620, 34 C.M.R. 400 (1964) (falsely made copy of allotment authorization not a proper subject of forgery—even though false document successfully used to defraud insurance company—because regulation required original form *in order to create, change, or terminate allotment*).

By contrast, *United States v. Addye*, 7 U.S.C.M.A. 643, 23 C.M.R. 107 (1957), involved a falsely made letter styled "Request for Partial Payment." This writing was purportedly signed by an adjutant and requested that the pay officials advance Addye the "maximum partial pay" due to the supposedly unexpected arrival of his family and the attendant financial hardship on them. Even though we noted that "the fiscal officer ... [was] not bound to honor the request," the governing regulations specifically authorized advancement of pay and allowances in emergencies. Thus, the letter asserted that the accused was a member of a class *entitled* to a benefit, and we concluded that it was effectively "an instrument which '*perfect[ed]*' the accused's legal *right* to partial payment." *Id.* at 645, 23 C.M.R. at 109 (emphasis added).

Similarly, in *United States v. Noel*, 11 U.S.C.M.A. 508, 29 C.M.R. 324 (1960), the accused had obtained *authorization* for a small loan by a relief society interviewer; but on his way to the society's treasurer, the accused increased the amount authorized. The society's "business practices" required "the treasurer ... to pay the amount shown on the application as authorized by the interviewer." *Id.* at 510, 29 C.M.R. at 326. Even though Noel had no legally enforceable right to any payment whatever from the society, we held that the altered document apparently "*confer[red]*" additional *rights* upon the accused to the prejudice of the Society." *Id.* at 511, 29 C.M.R. at 327 (emphasis added). *See also United States v. Taylor*, 9 U.S.C.M.A. 596, 26 C.M.R. 376 (1958) (forging of ration books by falsely making signature of authorizing official *perfected* accused's *right* to purchase goods); *United States v. Driggers*, 21 U.S.C.M.A. 373, 45 C.M.R. 147 (1972) (falsely made permanent-change-of-station order uttered to obtain travel request had apparent legal efficacy).

With these authorities in mind, we revisit the particulars of this case. First, the precise nature of the Army Aviation Center Federal Credit Union was not developed in the record. We are left to assume—and would have expected the Government to establish the contrary if it were so—that the credit union was not an agency of the United States Government but was rather a private association, albeit one likely to have been insured and regulated by an agency of the Federal Government.

Next we note that, pursuant to defense request, the military judge made the following specific findings of fact:

1. The Credit Union normally, but not always, requires submission of a "Commanding Officer's Letter" upon a soldier's initial loan application.

2. The Credit Union uses the letter to verify credit information and obtain additional data for consideration by its credit committee.

3. The Credit Union is not obligated to loan money solely upon presentment of a favorable "Commanding Officer's Letter."

4. The Credit Union is not required to alter or otherwise modify the security interest for a particular loan based upon a "Commanding Officer's Letter."

5. The Credit Union may elect to withhold credit from a soldier who presents a favorable "Commanding Officer's Letter."

6. Conversely, the Credit Union may extend credit to a soldier submitting an unfavorable "Commanding Officer's Letter" if the credit committee concludes, after consideration of the letter, that the applicant is otherwise "credit worthy."

Apart from these special findings, the judge gave no explanation for his denial of appellant's timely motion to dismiss the charge and specification.

These findings are consistent with the testimony of the credit union officials and, in particular, with that of the branch manager, who affirmed that the organization was "free in ... [its] best business judgment to completely ignore the commanding officer's letter if ... [it] so" chose. Factors which could influence favorable loan decisions, notwithstanding commanders' derogatory responses, included applicants' income-to-indebtedness ratios, credit histories, and collateral. Indeed, appellant presented evidence that, shortly after the charged incident, he successfully obtained a loan from a local bank in an amount considerably in excess of that sought from the credit union by using precisely the same collateral, an automobile, that he had offered the credit union.

Appellate government counsel do not dispute that the Code requires that the falsified writings have legal efficacy. Their contention is that this efficacy may arise through "a series of acts" in which the writing "could be regarded as a step." This contention is grounded on a misreading of language found in some of our earlier cases, particularly *United States v. Strand* and *United States v. Driggers*, both *supra*. In *Strand*, we stated:

The question arises ... whether the letter here [the fake letter informing the wife of Strand's death] *can be regarded as a step in a series of acts which might perfect a legal right or liability.*

(Emphasis added.) However, two sentences later, we made it clear that such a "step" had to have "legal significance" of its own, when we said:

Here again, however, we must distinguish between the apparent legal effect and the falsity of the contents of the letter. As to the former, the letter is valueless. Patricia did not acquire any right which she did not have before the letter came into existence. As previously noted, the letter is not evidence of death. It furnishes information, but it has no legal significance.

6 U.S.C.M.A. at 303, 20 C.M.R. at 19.

Similarly in *Driggers*, we stated that the falsified permanent-change-of-station order "must also either independently or as a step in a series appear to perfect a legal right or to impose a liability." 21 U.S.C.M.A. at 375, 45 C.M.R. at 149. The question in that case related to the *appearance* of the order, being unsigned. There was no dispute that, if genuine, the document would have legal efficacy, entitling Driggers to the travel request.

■ The record before us leaves no doubt that the false document was intended to facilitate appellant's obtaining the loan and that, if genuine, it might have had a decisive effect on the application. In that sense, the document could readily be seen "as a step in a series of acts which might perfect a legal right or liability." *United States v. Strand, supra*. But, again, the test for forgery—and derivatively for uttering a forged writing—is not whether the writing was a cause in fact or a *sine qua non* but whether it "would, if genuine, apparently *impose* a legal liability on another or *change* his legal right or liability to his prejudice." Art. 123 (emphasis added).

The document in question here asserted essentially that appellant had no financial or disciplinary problems and that he was an excellent soldier. It did not, by itself or in conjunction with anything else, purport

that he was entitled to any benefit or that he was a member of a class entitled to any benefit. The document also did not reflect or assert that the credit union was under any obligation to, or owed any duty to, appellant or anyone else. Under these circumstances, while the tendency to defraud is plain, the document lacked the requisite legal efficacy.[5] Therefore, we agree with appellant that the document cannot, as a matter of law, be the subject of forgery.[6]

This is not to suggest that appellant committed no crime or that the Government is without legal recourse to punish the misconduct. We shall not, however, attempt here to anticipate and pass upon the several avenues that may be available to the Government. We are mindful that Article 123, in its present form, creates a trap for unwary prosecutors, in that the legal-efficacy requirement may be overlooked. Our review, however, convinces us that Congress meant to inscribe this requirement into the law of forgery. If it is time to relax or abolish the requirement, that is a judgment for Congress to make.

### III

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The Additional Charge is dismissed.[7]

Judges COX and SULLIVAN concur.

---

5. Since the legal effect a document would have, if genuine, depends on rules of law defining liability for contracts and torts, it would appear that a change in those rules of law would cause a corresponding change in the scope of potential criminal liability for forgery. We are unaware of any current existing rule of law that would have imposed civil liability on appellant's commander if he had actually signed the credit-reference form.

6. In his treatise on criminal law, Professor Perkins indicates that potential, indirect consequences for the supposed writer of a letter of recommendation should be taken into account. Thus,

   [t]he writer of a letter recommending another as an honest and reliable person entitled to a position of responsibility will be legally liable if he knows the other to be unreliable and the recipient of the letter incurs loss as a result of employing the person upon this recommendation. Hence forgery may be committed by fraudulently signing another's name to such a letter. A mere letter of *introduction*, however, as distinguished from a letter of recommendation, is not the subject of forgery. Except for such a letter all of the writings so far mentioned have *apparent legal significance.*

   R. Perkins, *Criminal Law* 417 (3d ed. 1982) (footnotes omitted).

   The Government does not press such a theory in this case, and we do not embrace it since the indirect effects on appellant's commander were so remote as to be inconsequential. There was simply no reasonable possibility of adverse fallout—criminal, civil, administrative, or otherwise—on the commander by reason of appellant's use of the false document. Arguably, a different result might obtain if the document were intended to harm, or had some chance of redounding to the detriment of, the supposed writer—*e.g.*, if appellant had published a defamatory statement in the commander's name.

7. Nothing in this opinion, of course, precludes the Government from initiating a prosecution of appellant pursuant to appropriate charges, if it so wishes.